**FEDERAL PROPERTY MANAGEMENT CORPORATION et al., Plaintiffs-Appellees,**

v.

**Patricia Roberts HARRIS et al., Defendants-Appellants.**

Nos. 78–3275, 78–3346.

United States Court of Appeals, Sixth Circuit.

Argued Dec. 4, 1978.

Decided Aug. 21, 1979.

James C. Cissell, U. S. Atty., Susan J. Dlott, Asst. U. S. Atty., Dayton, Ohio, Bar-

bara Allen Babcock, Asst. Atty. Gen., Dennis G. Linder, Maryann Clifford, Dept. of Justice, Washington, D. C., for defendants-appellants in both cases.

Armistead W. Gilliam, Jr., Smith & Schnacke, Charles J. Faruki, Dayton, Ohio, Douglas B. Gregg, Cohen & Gregg Co., L. P. A., Dayton, Ohio, for plaintiffs-appellees in both cases.

William Kanter, Dept. of Justice, Washington, D. C., for defendants-appellants in 78–3346.

Before EDWARDS, Chief Judge, PHILLIPS, Senior Circuit Judge, and DeMASCIO,* District Judge.

DeMASCIO, District Judge.

The defendant-appellant Secretary of the Department of Housing and Urban Development (HUD) entered into rent supplement contracts with each of the plaintiffs-appellees, 34 owners of low and moderate income housing projects insured under Section 221(d)(3) and Section 236 of the National Housing Act.[1] *See* 12 U.S.C. § 1701 *et seq.* These rent supplement payments are made directly to each project owner for the benefit of eligible tenants to reduce their rent to 25% of their income or 30% of the approved rent, whichever is greater. Plaintiffs failed to make timely payments on their mortgages and, as a consequence, the mortgages were assigned to HUD by the original mortgagees. Rather than terminate the rent supplement contracts and institute foreclosure proceedings, the Secretary elected to set off the payments against plaintiffs' obligations under the delinquent mortgages.

The plaintiffs filed this action in the district court seeking a declaratory judgment that the Secretary's decision to set off plaintiffs' rent supplement payments was "without basis in law" and calculated to deprive plaintiffs of the ability to manage

---

* Honorable Robert E. DeMascio, United States District Judge for the Eastern District of Michigan, sitting by designation.

1. Section 221(d)(3) authorizes the rent supplement payments involved in this appeal. Under Section 236, HUD makes an interest reduction payment to the mortgagor to reduce the rent of eligible tenants. Congress passed these mortgage insurance programs to encourage development of low and moderate income housing projects by private investors.

their projects in keeping with "sound management procedures."[2] The parties stipulated to the material facts and filed cross motions for summary judgment with supporting affidavits. In his affidavit, Mr. Kalish, HUD's Deputy Director, asserts that it is HUD's policy not to terminate a rent supplement contract when a mortgage is in default in order to give the defaulting mortgagor "a reasonable opportunity to cure his default." Rather than making payments directly to the owner/mortgagor, however, the Secretary uses the sums earned under the rent supplement contracts to reduce the owners' delinquency. Mr. Kalish further states that HUD will release rent supplement funds when it is apparent that a project owner cannot meet utility costs or requires funds for emergency maintenance. On the other hand, the Executive Vice President of the plaintiff Management Corporation indicates in his affidavit that the actual rent received from the projects is insufficient to meet expenses and still make mortgage payments; that when rent supplement payments are withheld ". . . the projects become deteriorated and run-down [and] [t]his condition adversely affects the quality of life of the tenants."[3]

The district court granted plaintiffs' motion for summary judgment and ordered the Secretary to release all rent supplement payments previously withheld. Judgment and Order of March 15, 1978 and April 6, 1978. Although the court found that the Secretary had a common law and contractual right to set off the rent supplement payments against the plaintiffs' mortgage delinquencies, the court held that the decision to set off the rent supplement payments in this instance could not possibly advance national housing policy. The court reasoned that HUD was not an ordinary commercial lender and was not, therefore, free to operate in its own best financial interest, but had to advance national housing policy at all times. *Federal Property Management Corp. v. Harris,* 448 F.Supp. 560 (S.D.Ohio 1978). The district court indicated that it could not grasp the logic of the Secretary's assertion that setting off the rent supplements in lieu of contract termination could maintain tenant benefits and postpone foreclosure which, at the same time, provide the project owners an opportunity to cure their defaults. *Id.* at 562–63. The court stated:

> It is true that defendants' procedure has preserved tenant benefits. We cannot imagine however, that denial of "an integral part of the financial composite" of plaintiffs' projects will result either in cure of defaults or avoidance of foreclosure. The *more likely outcome* is a steady degradation of the facilities and a consequent loss of tenants, leading inevitably to foreclosure. Such a result will benefit neither the displaced residents nor the parties herein.
>
> The [c]ourt is aware that HUD has adopted the set-off policy in a well-intentioned attempt to steer a middle course between foreclosure and escalating mortgage losses. *Id.* at 563 (emphasis added).

In this appeal,[4] the Secretary argues that it was within her discretion to impose her set off policy in lieu of foreclosure. She further argues that, absent a determination that her actions were "arbitrary, capricious, an abuse of discretion or otherwise not in accordance with law," the district court had no authority to set aside her policy decision based solely upon a finding that her action would "more likely" cause a steady degradation of plaintiffs' projects. We agree and, therefore, reverse.

2. Plaintiffs also challenge the Secretary's decision not to implement the provisions of the 1974 Operating Subsidy Act, 12 U.S.C. § 1715z–1(f)(3). The district court stayed that claim, so it is not involved in this appeal. Order of March 16, 1978; appendix at 138.

3. The plaintiffs did not submit specific examples of these allegedly detrimental consequences in support of the conclusory statements contained in the affidavit nor did they factually establish that the deterioration of the projects, if any, was the result of HUD's policy rather than their own mismanagement.

4. Since relief was granted to several added plaintiffs, this controversy actually involves two consolidated appeals. The Secretary raises no objection to the amended complaint which added the new plaintiffs and, therefore, the two appeals pose identical questions.

With the passage of the Housing Act of 1949,[5] Congress sought to eradicate substandard living conditions and to provide a decent home for every American family. In Section 2 of the Act, Congress declared that the general welfare and security of the nation require:

housing production and related community development sufficient to remedy the serious housing shortage, the elimination of substandard and other inadequate housing through the clearance of slums and blighted areas, and *the realization as soon as feasible of the goal of a decent home and suitable environment for every American family* . . . . 42 U.S.C. § 1441 (emphasis supplied).

Thus, with passage of the Housing Act of 1949, 42 U.S.C. § 1441, and the Housing and Urban Development Act of 1968, 12 U.S.C. § 1701t, Congress established a national program to achieve the goal of a "decent home . . . for every American family." 42 U.S.C. § 1441 (1976). To attain this goal, Congress implemented a policy whereby:

(1) [P]rivate enterprise [would] be encouraged to serve as large a part of the total need as it can; (2) governmental assistance [would] be utilized where feasible to enable private enterprise to serve more of the total need . . . . 42 U.S.C. § 1441 (1976).

HUD was given broad powers to implement the national housing program, and was charged with the duty to exercise its

. . . powers, functions, and duties under this or any other law, consistently with the national housing policy declared by this Act and in such manner as will facilitate sustained progress in attaining the national housing objective hereby established . . . . 42 U.S.C. § 1441.

HUD was directed to encourage and to assist production of housing of sound standards of design, construction and livability, to reduce the cost of housing without sacrifice of standards, and to stabilize the housing industry. In 1968, Congress reaffirmed its housing goal and declared "that the sup-ply of the Nation's housing [was] not increasing rapidly enough to meet the national housing goal . . . ." 42 U.S.C. § 1441a (1976). Congress stressed the need to concentrate on preserving existing neighborhoods through rehabilitation and improvements in management and maintenance. 42 U.S.C. § 1441a(c) (1976). Congress repeated its national housing goal in the banking code, emphasizing that that goal had not yet been realized. Congress declared:

[T]he highest priority and emphasis should be given to meeting the housing needs of those families for which the national [housing] goal has not become a reality; and in the carrying out of such programs there should be the fullest practicable utilization of the resources and capabilities of private enterprise and of individual self-help techniques. 12 U.S.C. § 1701t (1976).

To effectuate its national housing goal, Congress authorized HUD to enter into rent supplement contracts with owners of low and moderate income housing projects as a means for creating low and moderate income rental units. 12 U.S.C. § 1701s (1976). The Secretary is authorized to establish criteria and procedures for determining the eligibility of tenants on whose behalf rent supplement payments will be made. 12 U.S.C. § 1701s(a) and (e) (1976). The Secretary is authorized to acquire possession of and title to any property either by a voluntary conveyance in extinguishment of the mortgage indebtedness or by foreclosure on property covered by the mortgage. Notwithstanding these provisions, the Secretary is empowered to pursue to final collection "by way of compromise *or otherwise* all claims assigned [to her,] notwithstanding *any other* provision of law." 12 U.S.C. § 1713(k) and (*l*) (emphasis added).

■ These provisions support our conclusion that the Secretary's decision to set off rent supplement payments against the project owners' delinquent mortgages is consistent with the national housing policy expressed in the acts. The Secretary's set off policy is a reasonable method to collect

---

5. *See* Housing Act of 1949, Ch. 338, 63 Stat. 413.

plaintiffs' delinquent payments in accordance with 12 U.S.C. § 1713(*l*) and cannot be viewed, in our opinion, as an abuse of discretion. Congress recognized that HUD's ability to achieve the national housing goal was limited by the enormity of the problem and that long range objectives had to be considered. *See Alexander v. U.S. Department of Housing & Urban Development,* 555 F.2d 166, 171 (7th Cir. 1977), *cert. granted,* 437 U.S. 903, 99 S.Ct. 1572, 60 L.Ed.2d 28 (1978). Thus, Congress repeatedly stressed the need for private enterprise to deal with the nation's long range housing problems.[6]

 In this case, the district court viewed HUD's discretion to implement national housing policy in too narrow a context by imposing upon HUD an obligation to fund, under all circumstances, housing programs that might, over any short range, assist qualified tenants. This holding does not take into account the long range problems HUD faces. The housing acts do not obligate the Secretary to guarantee that all federally funded housing projects will be continually maintained. *See Boston Public Housing Tenants' Policy Council, Inc. v. Lynn,* 388 F.Supp. 493, 495–96 (D.Mass. 1974). HUD must use available funds to achieve the ultimate goal of a decent home for every American family and cannot focus exclusively on a few projects. *See Silva v. East Providence Housing Authority,* 565 F.2d 1217, 1220 (1st Cir. 1977).

In deciding to set off rent supplement payments, the Secretary weighed the interests of the tenants to an immediate suitable living environment against the interests of the government in developing long range national housing policies. The Secretary recognized the tenants' interest by not terminating the rent supplement contracts and by not foreclosing the mortgage. She further protected the tenants' interests by releasing funds to pay for utility bills and emergency maintenance. At the same time, the Secretary considered long range national housing policy by avoiding foreclosure, which provides the defaulting mortgagors an opportunity to cure their default.[7] If the plaintiffs are correct in their assertion that they cannot meet current obligations and make mortgage payments on the rentals they receive, it is obvious these projects can never become economically feasible. Thus, long range national housing goals would be advanced by terminating these projects so that the money could be used elsewhere to encourage private enterprise to create and operate low and moderate income housing projects. By taking the middle ground between contract termination and total government subsidy, the Secretary has an opportunity to decide whether these projects can ever become a viable part of the national housing program.

 Even if we disagreed with the Secretary's decision, we could not substitute our judgment for hers unless we found her decision was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," the standard set forth in 5 U.S.C. § 706(2)(A). *Citizens to Preserve Overton Park, Inc. v. Volpe,* 401 U.S. 402, 416, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971). A court may not concern itself with the wisdom of agency action. *United States v. Allegheny-Ludlum Steel Corp.,* 406 U.S. 742, 749, 92 S.Ct. 1941, 32 L.Ed.2d 453 (1972). In this case, however, the district court did inquire into the wisdom of the Secretary's action rather than considering

---

6. *See* H.R.Rep.No.365, 89th Cong. 1st Sess. (1965), U.S.Code Cong. & Admin.News 1965, p. 2614 ("volume of housing needed to meet the needs of this group can be supplied best through the resources and initiative of private enterprise"); 12 U.S.C. § 1701t (1976); 42 U.S.C. §§ 1441 and 1441a(c) (1976).

7. We question why plaintiffs brought this action. The only benefit they receive from the judgment below is that the rent supplement payments go directly to them instead of being used to pay the debts of the housing projects. If plaintiffs were indeed interested in the long range viability of their projects they would be more than willing to apply the payments to their mortgages and remain current to avoid the slightest possibility of foreclosure. It appears to be to plaintiffs' benefit to operate as long as possible without paying on the mortgages, although this must mean the projects will eventually fail. This may be good for the individual project owners, but we fail to see how it helps to achieve broad national housing goals.

only the soundness of her reasoning. After finding that the Secretary's set off policy would preserve tenant benefits, the district court concluded that the "more likely outcome" of defendant's decision would not advance national housing policy. 448 F.Supp. at 563. It is not within the district court's scope of review, nor ours, to determine the most likely outcome of agency action. If the reasoning behind the agency's action is logical, and, in this case, we have concluded that it is, that action must be allowed to stand. That is true even if an alternative course of action would also be logical, since the agency must be allowed broad discretion to choose between alternative methods of achieving the national housing objectives. *Commonwealth of Pennsylvania v. Lynn,* 163 U.S.App.D.C. 288, 501 F.2d 848, 855 (D.C.Cir.1974).

Reversed with directions to enter judgment for defendant.