Robert CHASE, et al., Plaintiffs,

v.

THEODORE MAYER BROS., et
al., Defendants.

Civ. A. No. C–1–82–054.

United States District Court,
S.D. Ohio, W.D.

Nov. 14, 1983.

Ronnie E. Dixon, Legal Aid Society of Cincinnati, Cincinnati, Ohio, for plaintiffs.

Ronald L. McDermott, John J. Cruze, Asst. U.S. Atty., Robert E. Coletti, Keating, Muething & Klekamp, Stuart L. Richards, Anthony J. DeCenso, Cincinnati, Ohio, for defendants.

## MEMORANDUM AND ORDER

DAVID S. PORTER, Senior District Judge:

### I.

Plaintiffs in this action are five tenants in the Pendleton III housing project. This litigation was instituted in the Hamilton County Municipal Court against defendants Theodore Mayer Bros. Realtor and Samuel Pierce, in his official capacity as the Secretary of Housing and Urban Development (hereinafter "Secretary") (doc. 1, attachment). The action was subsequently removed to federal court at the behest of the United States (docs. 1, 2). Plaintiffs then filed an amended complaint (doc. 15), which added as party-defendants Anthony J. DeCenso and Clarence A. Doerger.

The gravamen of plaintiffs' complaint is that defendants have failed to maintain plaintiffs' apartments and common areas in a decent, safe and sanitary condition in accordance with the obligations imposed by the Cincinnati, Ohio Basic Building Code and Ohio Rev.Code § 5321.04, thereby breaching a warranty of habitability implied in plaintiffs' leases.

The Secretary filed a motion to dismiss or, in the alternative, for summary judgment, accompanied by a memorandum of law (doc. 12), to which plaintiffs responded (doc. 20). After the Secretary filed a reply brief (doc. 24), the court heard oral argument (doc. 32). At the invitation of the court, the parties filed supplemental memoranda in support of their respective positions (see docs. 33, 34, 35, 36, 37, 38). Defendant's motion is now before the court for disposition.

In its relevant aspects, plaintiffs' theory of the case is that HUD is bound by the Ohio Landlord-Tenant Act, see Ohio Rev. Code § 5321 et seq., to live up to the terms of a warranty of habitability which is an implied term in all leases of "residential premises" in Ohio. Plaintiffs seek both equitable relief and damages under the provisions of the Ohio statute. In the alternative, plaintiffs contend they have a private right of action under Section 203 of the Housing and Community Development Amendments of 1978, 12 U.S.C. § 1701z–11.[1]

By his motion, the Secretary raises several issues, including the defense of sovereign immunity, failure to state a claim upon which relief can be granted, the asserted inapplicability of state law to the activities of HUD in this context (e.g., preemption and intergovernmental immunity), and the asserted lack of a private right of action under the federal statutes.

### II.

Although we anticipate factual disputes when the merits of this case are reached, there is general agreement between the parties regarding the facts which are relevant to the instant motion. Pendleton III is a 78-unit multifamily rental housing project for low or moderate income families. The project is owned by general partners Clarence A. Doerger and Anthony J. DeCenso and has been managed by defendant Theodore Mayer Bros. Realtor (under contract with HUD) since February of 1981.

In February of 1971, HUD approved and provided mortgage insurance under Section 221(d)(3) of the National Housing Act of 1934, as amended, 12 U.S.C. § 1715l. The statute provides for HUD–FHA insurance

---

1. Plaintiffs briefed the implied right of action theory at the request of the Court.

of mortgage loans to assist in financing projects designed to provide housing for low and moderate income families. In addition, HUD provides Pendleton III with operating subsidies.

In February of 1977, the mortgage was assigned to HUD due to delinquent mortgage payments. HUD is obligated under its contract of mortgage insurance to accept the assignment of the mortgage securing the property upon a default in the insured mortgage. On October 20, 1979, because of continued default on payments, HUD became mortgagee-in-possession. As mortgagee-in-possession, HUD employs property managers to manage and operate the project and to secure needed repairs. Repairs are generally accomplished through the use of available rent income and operating subsidies.

Plaintiff tenants made repeated complaints to HUD concerning the disrepair of fixtures, filth, and vermin infestation in their apartments and surrounding environs. Some measures have been taken to correct these conditions. The tenants have, in the meantime, withheld rent payments and deposited the amount of those payments with the Clerk of the Hamilton County Municipal Court pursuant to Ohio Rev.Code § 5321.07.

### III.

#### Sovereign Immunity

The Secretary's first contention is that plaintiffs' claims for damages against HUD are barred by the doctrine of sovereign immunity. Although our disposition of the remaining issues in this case may blunt the thrust of the Secretary's attack in this regard, we think it is proper to dispose of the sovereign immunity issue in any event.[2]

12 U.S.C. § 1702 provides, *inter alia,* that the "Secretary shall, in carrying out the provisions of this subchapter ... be authorized, in his official capacity, to sue and be sued in any court of competent jurisdiction, State or Federal." The Secretary contends that the "sue and be sued" provision quoted above is merely a limited waiver of sovereign immunity and in no way confers an affirmative grant of jurisdiction, *citing Ames-Ennis, Inc. v. Midlothian Ltd., Etc.,* 469 F.Supp. 939, 942 (D.Md.1979). In support of his defense of sovereign immunity, the Secretary cites the Tenth Circuit's opinion in *United States v. Adams,* 634 F.2d 1261 (10th Cir.1980). In *Adams,* a developer sued HUD and a local housing authority, alleging that they were liable in contract for failure to make homesites available on a timely basis. The court held that the limited waiver of immunity expressed in the statute did not extend to a contract damage suit where plaintiff sought recovery beyond the monies appropriated or committed for a specific project. *Id.* at 1265–66.

We note, however, that in *Federal Housing Administration v. Burr,* 309 U.S. 242, 245, 60 S.Ct. 488, 490, 84 L.Ed.2d 724 (1940), the Supreme Court held that "sue and be sued" provisions like § 1702 should be construed liberally. The Court found that a creditor's garnishment action brought against the Federal Housing Administration to attach wages due an employee was within the waiver of immunity provided by Congress.

The Seventh Circuit's decision in *Merrill Tenant Council v. United States Department of Housing and Urban Development,* 638 F.2d 1086 (7th Cir.1981) is closer factually to the instant case. In *Merrill,* a tenant council sued for payment of interest on tenant security deposits on the theory that the Illinois statute requiring such interest payments was incorporated as an implied term in the tenants' leases with HUD. The court found that § 1702 operated as a waiver of sovereign immunity in that case, and that plaintiffs could proceed

---

**2.** In part V. of this memorandum, we hold that the tenants are not entitled to a damages remedy, although they may be entitled to equitable relief. We also find that equitable relief may include restitution of rents paid in certain cir-cumstances. The latter remedy is clearly equitable in nature, but since it involves a money recovery, we think it prudent to discuss and dispose of the sovereign immunity issue raised by the United States.

in contract to recover the interest due. In so holding, the court concluded that the action was within the limiting language of § 1702 in that it involved the Secretary's "carrying out" a provision of the National Housing Act. Specifically, the court found that the duty imposed by the Illinois statute arose by virtue of the federal mortgage insurance programs under which HUD is responsible for operating and leasing apartments. The court also noted that there were funds available from the specific project (*e.g.*, rents, security deposits) to pay a judgment apart from the general funds of the Treasury. *See also City of Philadelphia v. Page*, 363 F.Supp. 148 (E.D.Pa. 1973) (court found a waiver of sovereign immunity under § 1702 and under the Tucker Act, 28 U.S.C. § 1346(a)(2) in the context of an alleged breach of implied warranty of habitability in the sale of property by HUD).

██ We find the *Merrill* decision dispositive of this issue, and hold that plaintiffs' action is not barred by the doctrine of sovereign immunity. In so holding, we note that the Secretary's activities as mortgagee-in-possession in this case involve his "carrying out" the provisions of the National Housing Act, and that there are funds available apart from the general funds of the Treasury should plaintiffs be entitled to relief. The Secretary is therefore amenable to suit in this proceeding.

## IV.

### Implied Warranty of Habitability In Leases of HUD-Owned Property

Our research reveals only one circuit court opinion dealing with the implied warranty of habitability issue in this context. *See Alexander v. U.S. Department of Housing Development*, 555 F.2d 166 (7th

Cir.1977), *aff'd on other grounds*, 441 U.S. 39, 99 S.Ct. 1572, 60 L.Ed.2d 28 (1979).[3] In *Alexander*, as here, HUD insured repayment of a loan secured by a mortgage on an apartment housing project under § 221(d)(3) of the National Housing Act. In the face of continuing default by the developer, HUD acquired title to the property. The project was so deteriorated that HUD decided to terminate the project.[4]

During the time the project was operating, all tenants were required to post a $100.00 security deposit at the time of their initial tenancy. When the project was terminated, HUD returned the security deposits to all tenants who were current in their rent payments. In the case of five tenants, however, HUD applied their security deposits to the balance of any rent in arrears.

The aggrieved tenants contended that their obligation to pay rent was relieved by HUD's breach of the warranty of habitability which is to be implied in their leases. Thus, they argued, their security deposits were wrongfully withheld by HUD.

The court noted a substantial number of state court decisions "which have revolutionized the law of landlord-tenant relationships" by implying a warranty of habitability in residential leases. 555 F.2d at 170. The court, however, "decline[d] plaintiffs' invitation" to adopt a federal rule of decision creating a federal landlord-tenant law imposing a warranty of habitability in leases of apartments in federally-owned low income housing projects.

In so holding, the court reasoned:

We are not persuaded that such warranties should be implied in leases of dwelling units constructed and operated as public housing projects. In contrast to housing projects in the private sector,

---

**3.** "The tenants have not challenged [the Court of Appeals' decision that there was no federal implied warranty in their leases] ... and we therefore do not consider the issue." 441 U.S. at 45 n. 5, 99 S.Ct. at 1578 n. 5.

**4.** The court found

"[t]he project was infested with roaches and vermin; elevators were often inoperable; security was poor; hot water and heat were inadequate or non-existent; the buildings were often flooded; lighting was poor in the narrow hallways which were often cluttered with garbage; plumbing was deficient, and some tenants had electrical problems." *Id.* at 167–68.

the construction and operation of public housing are projects established to effectuate a stated national policy 'to remedy the unsafe and unsanitary housing conditions and the acute shortage of decent, safe, and sanitary dwellings for families of low income.' 42 U.S.C. § 1401. As such, the implication of a warranty of habitability in leases pertaining to public housing units is a warranty that the stated objectives of national policy have been and are being met. We feel that the establishment of any such warranty that national policy goals have been attained or that those goals are being maintained is best left to that branch of government which established the objectives.

*Id.* at 171.

This same rationale prompted the court to reject plaintiffs' suggestion that the provisions of the Housing Act and HUD's Property Disposition Handbook for Multifamily Properties, which impose obligations on HUD, its mortgagors and management agents to maintain public housing facilities, run to the benefit of the tenants as implied terms in their leases. The stated Congressional purpose of providing a "decent home and a suitable living environment for every American family," 42 U.S.C. § 1441,

> expresses general Congressional objectives.... These objectives [cannot] ... be interpreted to impose upon HUD or its agent an absolute, fixed obligation to maintain suitable dwellings .... Like many declarations of Congressional policy, 42 U.S.C. § 1441 sets forth broad future objectives on a grand scale which are to be accomplished over ... many years. The establishment of Congressional objectives, while certainly affording benefits to those eligible to partake of programs designed to attain those objectives, is not tantamount to a warranty that such objectives will be obtained.

*Id.*

In a different context, the Sixth Circuit spoke approvingly of the *Alexander* court's logic in *Federal Property Management Corp. v. Harris*, 603 F.2d 1226 (6th Cir. 1979). At issue in *Federal Property Man-*

*agement* was whether HUD may set off rent supplement payments against delinquent mortgage payments owed by the owners of low and moderate income housing projects. HUD's actions were found to be consistent with the national housing policy as expressed in the statutes. Citing *Alexander, supra,* the court agreed that HUD's ability to achieve the national housing goal was an enormous problem and that long-range objectives had to be considered. 603 F.2d at 1230. The court also found that

> [t]he district court viewed HUD's discretion to implement national housing policy in too narrow a context by imposing upon HUD an obligation to fund, under all circumstances, housing programs that might, over any short range, assist qualified tenants. This holding does not take into account the long range problems HUD faces. The housing acts do not obligate the Secretary to guarantee that all federally funded housing projects will be continually maintained. *See Boston Public Housing Tenants' Policy Council, Inc. v. Lynn*, 388 F.Supp. 4931, 495–96 (D.Mass.1974). HUD must use available funds to achieve the ultimate goal of a decent home for every American family and cannot focus exclusively on a few projects. *See Silva v. East Providence Housing Authority*, 565 F.2d 1217, 1220 (1st Cir.1977).

*See also Perez v. United States*, 594 F.2d 280 (1st Cir.1979) (no absolute duty imposed on HUD to make all HUD-financed public housing hazard-free); *Daniels v. United States Department of Housing and Urban Development*, 518 F.Supp. 989 (S.D.Ohio 1981) (Secretary has broad discretion in implementing the National Housing Acts).

There is authority, however, for the proposition that low income tenants in HUD-owned property have certain rights with respect to the "habitability" of their housing. First, we note that in *Estrada v. Hills*, 401 F.Supp. 429 (N.D.Ill.1975), plaintiffs, who lived in a building adjacent to vacant HUD property, were permitted

(over the federal defendants' claim of sovereign immunity) to maintain a damages action against certain HUD operatives who failed to maintain the property in accordance with state law and local codes, in violation of their non-discretionary duties. *Id.* at 437–38.

More to the point is the district court's decision in *Techer v. Roberts-Harris,* 83 F.R.D. 124 (D.Conn.1979). In *Techer,* the tenants of a federally-owned low income housing project applied for rent abatement because of the deplorable conditions in the project. HUD denied their application, and instituted eviction proceedings. Faced with the prospect of imminent eviction, the tenants filed suit in federal court, contending: (1) that HUD's failure to repair the premises violated the National Housing Act, 12 U.S.C. § 1701 *et seq.,* the national housing policies expressed in 42 U.S.C. §§ 1404a, 1441, 1441a, and § 203 of the Housing and Community Development Amendments of 1978, and (2) that HUD failed to comply with Connecticut's laws governing the rights and responsibilities of landlords and tenants. Plaintiffs contended that under the above-cited federal and state statutes, an implied warranty of habitability existed in their leases with HUD, which was breached by HUD when it failed to remedy the conditions. They sought a declaratory judgment, a permanent injunction restraining rent collections until the property met state and local standards, and restitution of all rent collected during the period of time in which the Secretary failed to provide decent, safe, and sanitary housing. *Id.* at 126 and n. 4.

In ordering preliminary injunctive relief against further collection of rent,[5] the Court found that Congressional expressions of our national housing policy and the transformation of landlord-tenant law evidenced in state statutes and court decisions

(and in at least one federal court decision with respect to private residential leases, *see Javins v. First National Realty Corporation,* 428 F.2d 1071 (D.C.Cir.), *cert. denied,* 400 U.S. 925, 91 S.Ct. 186, 27 L.Ed.2d 185 (1970)), made it possible for the tenants to get equitable relief for breach of an implied warranty of habitability under federal common law.

In a subsequent, unpublished "ruling on cross-motions for summary judgment," Civil No. N–78–484 (D.Conn. October 13, 1982), the court found that "the initial sense that for equitable purposes a warranty of habitability may be properly 'implied' seems perfectly correct." The court noted that the reasons for

> that public policy step are well known and compelling.... The harsh reality of current urban circumstances, involving persisting housing shortages and outright discrimination, is that the landlord has such bargaining power that the tenants are placed 'in a take it or leave it situation,' [*quoting Javins, supra* ].... Imposing a duty on the landlord as a matter of law to furnish housing which is at least livable in return for rental income does not represent a cure-all. It is but a minimal safeguard against the tenant's helpless subjection to the cruel paradox of intolerable, yet inescapable, housing conditions.

The court opined that the Seventh Circuit's decision in *Alexander v. United States Department of HUD, supra* "yields no persuasive reason to withhold full equitable relief in the instant case." The court therefore renewed its earlier determination that equitable relief, including restitution of rent payments wrongly exacted when the housing at issue was not habitable, is "fully consistent with long-elusive national

---

5. The Court established an escrow fund and ordered all tenants to pay their rent into this fund during the pendency of the litigation. This procedure is similar to that employed by the Ohio Landlord-Tenant Act. Ohio Rev.Code § 5321.07. It is a meritorious procedure because: (1) it is a powerful tool to motivate private sector landlords to remedy unsafe and unhealthy conditions in their tenants' apartments, and (2) by requiring the tenants to continue with rent payments, it helps to ensure that the tenants indeed have a real "breach of warranty."

housing goals." [6] However, the court agreed with the *Alexander* court that "it does seem appropriate for a court to reserve for Congress any decision to impose upon the government in all circumstances" an absolute, fixed obligation to maintain suitable dwellings. Accordingly, the court reiterated its earlier position that an implied right of action for compensatory damages was not, in its view, available. The court found "no sufficient indication" that Congress envisioned such a remedy, *see Cort v. Ash*, 422 U.S. 66, 95 S.Ct. 2080, 45 L.Ed.2d 26 (1975), and held: "[t]hat course would be a far-reaching step with unpredictable, and not necessarily beneficial, results overall even in its impact on HUD's ultimate discharge of housing assistance responsibilities, delegated by Congress with some necessary discretion meriting recognition."

Plaintiffs have provided us with another unpublished district court opinion wherein the court ruled that a federal remedy exists for tenants of HUD-owned low income housing projects. In *Wilson v. Pierce*, Civil Action No. 81–264 (W.D.Pa. August 11, 1982), the court overruled the Secretary's motion to dismiss, and in so doing held: (1) "the [c]ourt may find that HUD's failure to maintain the housing stock in decent condition constitutes breach of an implied contractual provision under federal common law .... [; (2) ] [a]lternatively, this [c]ourt may find that HUD has abused its discretion in failing to take steps to maintain the housing in decent condition, which would effectively impose a warranty of habitability for National Housing Act projects." [Citation omitted]. The court went on to note that the Third Circuit's decision in *Girard Trust Co. v. United States*, 149 F.2d 872,

874 (3d Cir.1945) requires that plaintiffs' rights be derived from federal law, in spite of the "trend toward adoption of state laws as the federal rule of decision in real property cases." [Citation omitted]. Finally, unlike the *Techer* court, the district court refused to strike plaintiffs' claims for compensatory damages, citing *Merrill Tenant Council, supra*. See generally, *Implied Warranty of Habitability in Federal Housing Projects*, 19 B.C.L.R. 343 (Jan. 1978).

We find the criticisms of the Seventh Circuit's decision in *Alexander* as expressed by the district court in *Techer* on the mark. We are more persuaded by the analysis in *Techer* and *Wilson, supra*, and therefore conclude that plaintiffs may maintain a cause of action. We do not think that the language or analysis of the Sixth Circuit in *Federal Property Management, supra*, preclude all relief in this case.[7] We will now attempt to define the parameters of the cause of action maintainable by plaintiffs and the remedies available to them insofar as it is appropriate at this stage of the case.

### V.

*Preemption-Intergovernmental Immunity*

■ Plaintiffs seek to pursue a direct action against HUD under the Ohio Landlord-Tenant Act. For the reasons set forth below, we hold that such an action is not available, and therefore grant the Secretary's motion to dismiss insofar as plaintiffs' complaint seeks relief directly under the Ohio statute.

■ The district courts in *Techer* and *Wilson* chose to follow a *federal* rule of

---

6. "Indeed, what does seem inconsistent with Congressional policy is to allow a public agency to play the role of slumlord with impunity, collecting rents without respect for the tenants' living conditions." Unpublished ruling at p. 5.

7. We recognize, as did the court in *Federal Property Management*, that the "housing acts do not obligate the Secretary to guarantee that all federally funded housing projects will be continually maintained." 603 F.2d at 1230. The Secretary may, for instance, determine that a project

should be demolished and therefore decide that certain maintenance would be a waste of funds. As we note later in this opinion, the courts must be sensitive to the discretionary nature of certain HUD functions. However, to the extent that *Federal Property Management* can be read to suggest that tenants in continually occupied HUD projects have no right to seek relief for uninhabitable conditions, that suggestion is *dictum.*

decision with respect to the warranty of habitability implied in leases of HUD-owned property. The court in *Wilson* found that, although the "trend is toward adoption of state laws as the federal rule of decision in real property cases, *Powers v. U.S. Postal Service*, 671 F.2d 1041, 1043–44 (7th Cir.1982)," it was constrained to follow the Third Circuit's decision in *Girard Trust Co. v. United States*, which held that a lease to which the United States is a party is governed by federal common law.

Plaintiffs observe that landlord-tenant relations have traditionally been an area of local interest. *See Lindsey v. Normet*, 405 U.S. 56, 92 S.Ct. 862, 31 L.Ed.2d 36 (1972). Plaintiffs then suggest that, since the Ohio Landlord-Tenant Act and local housing codes do not conflict with federal laws designed to ensure safe and sanitary housing, the rule of decision should be the Ohio rule.

The courts have found that, while a lease may concern and convey a property interest, it is also very much in the nature of a contract. "[I]t is settled that the contracts of the Federal Government are normally governed, not by the particular law of the states where they are made or performed, but by a uniform federal law." *Keydata Corporation v. United States*, 504 F.2d 1115 (Ct.Cl.1974); *see also Alexander v. U.S. Department of HUD, supra* (by implication). In *Javins v. First National Realty Corporation, supra*, Judge Wright determined that in the case of the modern urban residential lease, the contractual aspect predominates.

> "The assumption of landlord-tenant law, derived from feudal property law, that a lease primarily conveyed to the tenant an interest in land may have been reasonable in a rural, agrarian society; it may continue to be reasonable in some leases involving farming or commercial land .... But in the case of the modern

apartment dweller, the value of the lease is that it gives him a place to live." 428 F.2d at 1074. *See generally*, 2 R. Powell, Real Property ¶ 221[1] at 179 (1967).

Other considerations prompt us to conclude that the rule of decision in this case must be a federal rule. As the Secretary observes, Section 203 of the Housing and Community Development Amendments of 1978 sets out a comprehensive policy governing the maintenance and disposition of federally-owned properties. Emanating from the housing statutes are detailed regulations and internal policies promulgated by the Secretary which prescribe HUD's responsibilities with respect to properties it owns or acquires as mortgagee-in-possession. *See* 24 C.F.R. § 220.1 *et seq.* and HUD Property Disposition Handbook-Multifamily Properties. Circumstances will likely arise where the various state statutes governing landlord-tenant relationships in the private sector would be inappropriate in the public housing sector, since such laws may unduly restrict the Secretary in the exercise of his Congressionally-mandated discretion in carrying out the purposes of the Housing Acts.[8]

In sum, the direct subjection of HUD to the myriad (and still developing) state landlord-tenant regulatory schemes creates a potential, yet real "undue burden" on the Department's performance of its functions. *See Anderson National Bank v. Luckett*, 321 U.S. 233, 64 S.Ct. 599, 88 L.Ed. 692 (1944); *Federal National Mortgage Ass'n v. Lefkowitz*, 390 F.Supp. 1364 (S.D.N.Y. 1975). *See generally* 19 Wright, Miller & Cooper § 4514 (1982).

■ In this vein, we agree with the reasoning of the district court in *Techer, supra*, that a compensatory damages remedy (over and above restitution of rents paid during the period in which an apartment is not "habitable") is not warranted. The courts have frequently recognized instanc-

---

8. *See* 12 U.S.C. § 1701z–11 which provides: "The Secretary, in determining the manner by which a project shall be managed or disposed of, may balance competing goals relating to individual projects in a manner which will further the achievement of the overall purpose of this section."

es where an equitable remedy is sufficient to redress the balance, ruling out a damages remedy as improvident. *See, e.g., Heimbach v. Village of Lyons,* 597 F.2d 344 (2d Cir.1979) (judges are absolutely immune from damage recoveries predicated on 42 U.S.C. § 1983 violations, but are not absolutely immune from prospective equitable relief with respect to their judicial acts). Ohio law, however, provides a compensatory damages remedy for aggrieved tenants. *See* Ohio Rev.Code § 5321.12.

This does not mean that state law cannot be adopted as the federal rule of decision in instances where it is compatible with the federal statutory and regulatory scheme. Indeed, the states have had far more experience in devising remedies for tenants in the private housing sector. The federal courts are free to incorporate local rules of decision as the "federal law." *See* 19 Wright, Miller & Cooper § 4514 at 262–265 and the authorities cited therein. In exercising our power to "choose" law, we must constantly keep in mind that our choice cannot conflict with Congressional expressions of policy. We must also remember that the detailed regulatory scheme developed by HUD weighs heavily in the balance. But it is a balance, and we are therefore not constrained to reject all state and local laws and regulations, even though they will obviously differ from jurisdiction to jurisdiction. *See Merrill Tenant Council, supra.* That this choice of law process will be difficult and will demand sensitivity to competing factors does not counsel against its exercise.

## VI.

### *Federal Common Law—As It Applies In This Case*

In fashioning a rule to govern this case, we are mindful that we are developing federal common law. Federal common law, like the general common law, develops on a case-by-case basis. Its development is limited by the facts of the case—anything more is simply advisory. We do not set out

to write a comprehensive federal rule which would govern the entire field of federal landlord-tenant relationships. Such an effort would be improvident. Furthermore, we are aware of the context within which we work. We are ruling on the Secretary's motion for summary judgment. With this in mind, we will attempt to outline what the rule of law will be in this case, recognizing that we need not go too far since the issues may have changed (or some may have become moot) since this suit was filed.[9]

Professor Wright has observed:

The exercise of [the federal courts' power to make federal common law] should not be viewed as radical and anti-democratic .... After all, judges often must 'legislate' as they try to divine and implement congressional intent that often is not clearly expressed in a statute. The difference between federal common law, judiciously exercised, and the application of federal statutes to specific cases, especially when it involves the construction and enforcement of broadly worded provisions, is one of degree. As Justice Holmes once observed: 'I recognize without hesitation that judges do and must legislate, but they do so only interstitially; they are confined from molar to molecular motions.'

19 Wright, Miller and Cooper § 4514 at p. 221 [footnotes omitted].

The creation of federal common law may be appropriate where

Congress ... has not provided a rule of decision for the resolution of a federal question case that is properly within the subject matter jurisdiction of the federal courts. Concomitantly, congressional or constitutional intent can be inferred that the federal courts should supply the necessary rule of decision by pronouncing common law to fill the interstices of a pervasive federal framework.

*Id.* at 224. We note that while the Supreme Court has limited the development

---

**9.** For example, this Court has learned that some of the major repairs demanded by the tenants

have been accomplished. This obviously affects the nature and extent of relief warranted, if any.

of federal common law to a few "narrow areas," one of these "areas" are cases involving the rights and *obligations* of the United States. *Texas Industries, Inc. v. Radcliff Materials, Inc.*, 451 U.S. 630, 641, 101 S.Ct. 2061, 2067, 68 L.Ed.2d 500 (1981).

Our review of the housing statutes [10] and legislative history [11] does not illuminate a clear path to the construction of appropriate remedies in cases like this. We do note, however, that this is not a case where

> [t]he presumption that a remedy was deliberately omitted from a statute is [strongly suggested] when Congress has enacted a comprehensive legislative scheme including an integrated system of procedures for enforcement .... The judiciary may not, in the face of such comprehensive legislative schemes, fashion new remedies that might upset carefully considered legislative programs.

*Northwest Airlines, Inc. v. Transport Workers Union of America, AFL–CIO,* 451 U.S. 77, 97, 101 S.Ct. 1571, 1583, 67 L.Ed.2d 750 (1981).

The applicable housing statutes and the regulations promulgated thereunder, to the best of our knowledge, *contain no enforcement scheme* operating in favor of plaintiffs. The Secretary contends: (1) that the state landlord-tenant act does not apply of its own force (we agree, *see ante* ); and (2) there is no federal cause of action because (i) Congress has not provided one, and (ii) Congress vested the Secretary with such broad discretion in carrying out the national housing policy that any remedy would tend to erode that discretion.

Although the national housing policy has found expression in more than one Act,[12] the parties seem to agree that plaintiffs are most directly benefitted by Section 203(a) of the Housing and Community Development Amendments of 1978, as amended by Section 213 of the Housing and Community Development Act of 1980, 12 U.S.C. § 1701z–11. That statute provides:

> (a) It is the policy of the United States that the Secretary of Housing and Urban Development ... shall manage and dispose of multifamily housing projects which are owned by the Secretary in a manner consistent with [the National Housing Act] and this Section. The purpose of the property management and disposition program of the Department of Housing and Urban Development shall be to manage and dispose of projects in a manner which will protect the financial interests of the Federal Government and be less costly to the Federal Government than other reasonable alternatives by which the Secretary can further the goals of—
>
> (1) preserving the housing units so that at least those units which are occupied by low- and moderate-income persons or which are vacant, at the time of acquisition, are available to and affordable by such persons;
>
> (2) preserving and revitalizing residential neighborhoods;
>
> (3) *maintaining the existing housing stock in a decent, safe and sanitary condition* [emphasis added];
>
> (4) minimizing the involuntary displacement of tenants;
>
> (5) minimizing the need to demolish projects; and
>
> (6) maintaining the project for the purpose of providing rental or cooperative housing.
>
> The Secretary, in determining the manner by which a project shall be managed or disposed of, may balance competing goals relating to individual projects

---

**10.** See the National Housing Act of 1934, 12 U.S.C. § 1701 *et seq.*, the Housing Act of 1937, 42 U.S.C. § 1401 *et seq.*, the Housing Act of 1949, 42 U.S.C. § 1441, the Housing and Urban Development Act of 1968, 42 U.S.C. § 1441a, § 203(a) of the Housing and Community Development Amendments of 1978, as amended by Section 213, Housing and Community Development Act of 1980, 12 U.S.C. § 1701z–11.

**11.** *See* 1949 U.S.Code Cong. & Admin.News, pg. 1550; 1968 U.S.Code Cong. & Admin.News, pg. 2873; 1978 U.S.Code Cong. & Admin.News, pg. 4773, 1980 U.S.Code Cong. & Admin.News, pg. 3506.

**12.** See n. 10, *ante.*

which will further the achievement of the overall purpose of this section.

. . . .

(c) Except where the Secretary has determined that it would be clearly inappropriate, given the manner by which an individual project is to be managed or disposed of pursuant to subsection (a) of this section, the Secretary shall seek to—

(1) maintain all occupied multifamily housing projects owned by the Secretary in a decent, safe and sanitary condition;

(2) to the greatest extent possible, maintain full occupancy in àll multifamily housing projects owned by the Secretary; and

(3) maintain the project for purposes of providing rental or cooperative housing for the longest feasible period.

■ The district court in *Techer* found, we think correctly, that a private right of action for damages on behalf of the tenants is unwarranted. Nothing in the statute or the legislative history, (see note 11, *ante* ), evidences an intent on the part of Congress to create a private damages remedy. *See* 83 F.R.D. 124, 131. With respect to the availability of a private damages remedy, the Supreme Court has recently held that "[t]he key to the inquiry is the intent of the Legislature." *Middlesex County Sewerage Authority v. National Sea Clammers Ass'n.*, 453 U.S. 1, 13, 101 S.Ct. 2615, 2622, 69 L.Ed.2d 435 (1981) [Citations omitted].

At the same time, the federal courts' power to grant relief not expressly authorized by Congress is firmly established. *Bush v. Lucas*, 462 U.S. 367, 103 S.Ct. 2404, 76 L.Ed.2d 648 (1983). As we noted above, equitable relief may be appropriate in cases where a remedy at law for damages is not. *See Davis v. Passman*, 442 U.S. 228, 99 S.Ct. 2264, 60 L.Ed.2d 846 (1974).

■ It is our considered opinion that equitable relief is not at odds with the Housing and Community Development legislation or the other enactments by Congress in this area. Plaintiffs are clearly within the class to be benefitted by this legisla-

tion. *Cort v. Ash*, 422 U.S. 66, 95 S.Ct. 2080, 45 L.Ed.2d 26 (1975). Importantly, equitable relief can be tailored so that it is consistent with the underlying purposes of the legislative scheme, *id.*, and so it does not interfere with the proper exercise of the Secretary's discretion under the statutes. We should not forget that the *overall* purpose of the various housing acts is that of "a decent home and a suitable living environment for every American family." *See* 42 U.S.C. § 1441, 12 U.S.C. § 1701t. It is clear from the more recent housing enactments and the relevant legislative history that Congress is deeply concerned that the goal has not materialized. *See, e.g.*, 12 U.S.C. § 1701t ("the highest priority and emphasis should be given to meeting the housing needs of those families for which the national goal has not become a reality").

Focusing again on the Housing and Community Development Amendments of 1978, as amended, 12 U.S.C. § 1701z–11, Congress clearly intended the Secretary to "maintain all occupied multifamily housing projects owned by the Secretary in a decent, safe, and sanitary condition," except where the Secretary has determined on a case-by-case basis that this would be clearly inappropriate. We have not been advised by the Secretary that this is one of those individual cases where, in his best judgment, it is not appropriate to maintain plaintiffs' apartments in a decent, safe and sanitary condition. At trial on the merits, the Secretary will of course have an opportunity to make this point if it bears on the issues in this case. We assume that in almost every case involving a project which will be occupied for the foreseeable future, the Secretary would direct that the units be maintained properly (recognizing that certain maintenance might be deferred on projects scheduled for demolition, etc).

Declaratory and injunctive relief will be available to plaintiffs if they prevail on the merits. Pro-rata restitution of rents paid during the period in which an individual unit is found to fall below a "habitable" condition will also be available. The

amount of such restitution will depend on the extent of the deficiency.

We will look to the requirements of all applicable building, housing, health, and safety codes which materially affect health and safety, *see* Ohio Rev.Code § 5321.04, to measure compliance with the warranty of habitability.[13] We need not decide at this time whether plaintiffs are entitled to escrow rent payments with this court during the pendency of a warranty enforcement action.[14] We will look to (but not be bound by) the provisions of the Ohio Landlord-Tenant Act should we need to further develop the rights and remedies of the plaintiffs in this case.[15]

One additional issue raised by the Secretary must be addressed. He contends that responsibilities placed on his department by the statutes dealing with HUD-*owned* property do not necessarily apply where HUD is the mortgagee-in-possession. The Secretary admits, however, that his authority to maintain projects where HUD is the mortgagee-in-possession is contained in 24 C.F.R. 290.10. That regulation requires the Secretary, *inter alia,* to

    (a) provide a level of services necessary to maintain occupied housing in decent, safe and sanitary condition in the most cost-efficient manner;

    . . . .

    (c) provide and to occupy fully as many decent, safe, and sanitary dwelling units as possible, consistent with the need for the type and size of the units.

That regulation, which by its terms is applicable only to HUD-owned property, is made applicable to the management and operation of mortgagee-in-possession properties

by Chapter 3, ¶ 58, HUD Property Disposition Handbook, Multifamily Properties, 4315.1 (see doc. 33 and affidavit of Richard J. Graff, a Realty Specialist employed by HUD).[16]

*Conclusion*

As plaintiffs note, the HUD handbook also provides that HUD lease forms "place definite responsibilities upon both the landlord and tenant to keep the property in good repair ...." Chapter 8, ¶ 210. We also note that property is not eligible for mortgage insurance unless the "property, including improvements, shall comply with any material zoning or deed restrictions applicable to the project site and with all applicable building and other governmental regulations." 24 C.F.R. § 221.545(c). Essentially, the Secretary has ruled that buildings such as the ones in which plaintiffs live are not eligible for federal mortgage insurance unless they are "decent, safe, and sanitary." It would, we think, be a rather cynical perversion of the manifest intent of Congress to hold that HUD does not bear the same responsibility once the property is insured—and after default. The tenants of such housing have the right to seek judicial enforcement of that responsibility if it is not being carried out.

## ORDER

For the foregoing reasons, the Secretary's motion to dismiss is granted to the extent that plaintiffs' complaint seeks direct relief under state law and local codes. The motion is also granted with respect to plaintiffs' claims for compensatory dam-

---

**13.** *See Javins v. First National Realty Corporation, supra.* Judge Wright determined that in all private residential units in the District of Columbia, a warranty of habitability, measured by relevant local health and housing codes, would be implied in the leases.

**14.** This is the approach taken by the district court in *Techer,* 83 F.R.D. at 131–32. *See* Ohio Rev.Code § 5321.07.

**15.** We note that Ohio Rev.Code § 5321.05 sets forth the "obligations of tenants." These obliga-

tions include "[k]eep[ing] that part of the premises that he occupies and uses safe and sanitary." O.R.C. § 5321.05(A)(1). Plaintiffs in this case bear that same responsibility. HUD will not be held responsible for, and plaintiffs will not be entitled to relief from, conditions for which they bear responsibility.

**16.** The documents of record in this case show that HUD, as mortgagee-in-possession, carries out traditional landlord functions (or employs an agent to do so).

ages. In all other respects, the motion is denied.

SO ORDERED.