**Marie CONILLE, Plaintiff,**

**v.**

**Samuel R. PIERCE, in his capacity as Secretary of the United States Department of Housing and Urban Development, and Interim Management, Inc., Defendants.**

**No. 85–2389–K.**

United States District Court,
D. Massachusetts.

Dec. 1, 1986.

As Modified Dec. 16, 1986.

Marc Lauritsen, John Griffin, Paul R. Collier, William C. Spieth, Cambridge, Mass., for plaintiff.

Martha B. Sosman, Asst. U.S. Atty., for defendants.

KEETON, District Judge.

Plaintiff is a former tenant of an apartment in the Washington Apartments project in Dorchester. The Washington Apartments project was one of a group of five residential building projects, collectively known as the Granite Properties, which were rehabilitated in the late 1960s with mortgage loans insured by the United States Department of Housing and Urban Development ("HUD"). The loans were made as part of the Below Market Insurance Rate ("BMIR") program, 12 U.S.C. § 1715l (d)(3), of the National Housing Act ("NHA"), 12 U.S.C. § 1701, et seq. Under the BMIR program, a private lender makes a mortgage loan to the mortgagor at a reduced interest rate, and a division of HUD purchases the mortgage at 100% of face value. The result is a lowering of the debt service payments and a subsidizing of tenants' rents.

During plaintiff's tenancy, the owners of the Washington Apartments, as well as the owners of the other Granite Properties, defaulted on their mortgage obligations. HUD then paid the insurance claim on the Washington Apartments complex, took assignment of the mortgage, and on May 10, 1982, became mortgagee in possession ("MIP") pursuant to section 207(k) of the NHA, 12 U.S.C. § 1713(k). As MIP, HUD was responsible for all aspects of property management, including rent collection and property maintenance. HUD hired defendant Interim Management, Inc. to manage the Washington Apartments.

Plaintiff has brought this civil action against the Secretary of HUD and Interim Management, alleging that they failed to maintain her apartment in a habitable condition and seeking damages or restitution of rental payments. She asserts four causes of action against the Secretary: first, breach of an implied warranty of habitability owed to her under state and federal common law; second, breach of quiet enjoyment under Mass.Gen.Laws Ann. ch. 186, § 14 and federal law; third, unfair and deceptive practices under Mass. Gen.Laws Ann. ch. 93A, § 9; fourth, failure to return her security deposit at the termination of her tenancy under Mass. Gen.Laws Ann. ch. 186, § 15B(5) and (7).

The Secretary has asserted affirmative defenses of sovereign immunity and federal supremacy. A trial on these affirmative defenses was held on September 3, 1986, without the participation of defendant Interim Management. During oral argument, counsel for plaintiff and the Secretary agreed that they had submitted sufficient evidence to allow me to make fact findings concerning the conditions in plaintiff's apartment and to determine whether those conditions were in compliance with applicable legal standards.

I.

It is well established that the United States or a federal official acting in his or

her official capacity cannot be sued without consent. The Secretary argues that plaintiff has failed to establish a waiver of sovereign immunity under either the NHA or the Tucker Act, 28 U.S.C. § 1346(a)(2).

Plaintiff contends that this action falls within the waiver of sovereign immunity contained in § 1 of the NHA, which states:

The Secretary shall, in carrying out the provisions of [the NHA], be authorized, in his official capacity, to sue and be sued in any court of competent jurisdiction, State or Federal.

12 U.S.C. § 1702. Defendant responds that § 1702 does not apply because first, the payment of damages to tenants does not fall within the "carrying out" requirement of § 1702, second, HUD does not have separate funds under its control from which to satisfy plaintiff's damages claims, and third, waiver of sovereign immunity to allow suits for damages or restitution of rental payments would be inconsistent with the statutory grant of discretion to the Secretary to set rents in HUD-controlled properties.

■ The Secretary's first argument, that plaintiff's claims do not come within the § 1702 waiver because the payment of her damages claims would not itself involve the "carrying out" of any provision of the NHA, is a rather strained interpretation of the "carrying out" requirement. A more natural reading of this provision focuses on the actions underlying the claim, rather than on the relief sought. Plaintiff's claims are based on the Secretary's actions in operating the project as MIP. Because the Secretary's authority to take possession of and operate plaintiff's project derives from the NHA, his actions in operating the project necessarily involve carrying out the provisions of the Act, and therefore satisfy the "carrying out" requirement of § 1702. See · Chase v. Theodore Mayer Bros., 592 F.Supp. 90, 93 (S.D.Ohio 1983).

Defendant further argues that plaintiff's claims do not involve the Secretary's actions in carrying out the NHA because her claims are for breaches of state statutory and state and federal common law duties

that defendant contends are not imposed by the NHA. If plaintiff's claims did not involve duties imposed by the NHA, the argument that a suit based on a breach of such duties would not be based on the Secretary's carrying out the provisions of the Act might have merit. However, because I conclude, *infra*, that plaintiff's claims are based on duties imposed by the NHA, it is not necessary for me to decide the merit of that argument.

The Secretary next argues that plaintiff's damages claims cannot fall within the § 1702 waiver because the Secretary does not have funds under his control from which a damage award could be satisfied. The separate fund requirement on which defendant relies is derived from interpretations of *FHA v. Burr*, 309 U.S. 242, 60 S.Ct. 488, 84 L.Ed. 724 (1940), which the First Circuit has called the seminal case concerning § 1702. See *Armor Elevator Co. v. Phoenix Urban Corp.*, 655 F.2d 19, 21 (1st Cir.1981). In *Burr*, the Court stated:

Claims against a corporation are normally collectible only from corporate assets. That is true here. Congress has specifically directed that all such claims against the Federal Housing Administration of the type here involved "shall be paid out of funds made available by this Act." § 1. Hence those funds, and only those, are subject to execution. The result is that only those funds which have been paid over to the Federal Housing Administration in accordance with § 1 and which are in its possession, severed from Treasury funds and Treasury control, are subject to execution.

309 U.S. at 250, 60 S.Ct. at 493. Subsequent lower court decisions have interpreted this passage of *Burr* as mandating that the Secretary possess and control a separate fund from which a judgment could be satisfied in order for a § 1702 waiver to apply. *E.g. Merrill Tenant Council v. HUD*, 638 F.2d 1086 (7th Cir.1981).

The First Circuit commented on the separate fund requirement in *Armor Elevator*, *supra*, stating, "We believe this too narrow

an interpretation." 655 F.2d at 21. The defendant argues that this criticism of the separate fund requirement, included only as an alternative ground of decision, is not binding on district courts in this circuit. Nevertheless, this court considers itself bound by the considered dicta of the First Circuit and therefore holds that a separate fund is not required in order to create a valid waiver of sovereign immunity under § 1702. *Taylor Woodrow Blitman Construction Corp. v. Southfield Gardens Co.*, 534 F.Supp. 340, 343 (D.Mass.1982).

The Secretary's third argument is that claims based on the alleged overpayment of rent are inconsistent with his statutory discretion to set rents, and therefore should be excepted from the § 1702 waiver provision. In *Burr*, the Supreme Court held that exceptions to the § 1702 waiver could not be lightly assumed to be implied:

> [W]hen Congress establishes such an agency, authorizes it to engage in commercial and business transactions with the public, and permits it to "sue and be sued," it cannot be lightly assumed that restrictions on that authority are to be implied. Rather if the general authority to "sue and be sued" is to be delimited by implied exceptions, it must be clearly shown that certain types of suits are not consistent with the statutory or constitutional scheme, that an implied restriction of the general authority is necessary to avoid grave interference with the performance of a governmental function, or that for other reasons it was plainly the purpose of Congress to use the "sue and be sued" clause in a narrow sense. In the absence of such showing, it must be presumed that when Congress launched a governmental agency into the commercial world and endowed it with authority to "sue or be sued," that agency is not less amenable to judicial process than a private enterprise under like circumstances would be.

309 U.S. at 245, 60 S.Ct. at 490 (footnote omitted). Thus, to prevail in this argument, the Secretary must clearly show that plaintiff's claims are inconsistent with the statutory scheme.

The Secretary argues that claims for restitution or damages based on the amount of rent paid are inconsistent with his discretion to regulate rents under 12 U.S.C. § 1715*l* (d)(3) and to expend funds "to preserve or protect the lien" of the mortgage during the MIP period under 12 U.S.C. § 1713(k). This argument rests on the characterization of a retrospective judicial order of damages or restitution as a prospective rent-setting procedure, and on the assumption that the Secretary has absolute discretion over the management of MIP properties so that any judicial enforcement of a duty owed by the Secretary to tenants would conflict with that discretion. For reasons set forth in Part II, *infra*, I conclude both that a judicial order of damages or restitution as a remedy for failure to maintain premises in a habitable condition does not conflict with the Secretary's discretion to set rents in HUD projects, and that the Secretary does not possess total discretion to operate MIP projects, but instead owes certain duties to tenants under the NHA. I therefore conclude that the Secretary has not clearly shown that plaintiff's claims for damages or restitution are inconsistent with the statutory scheme of the NHA.

■ The Secretary also raises two specific objections to the nature of plaintiff's claims. First, he argues that plaintiff's claims for emotional distress under Counts I and II sound in tort and therefore fall within the exclusive remedy of the Federal Tort Claims Act, 28 U.S.C. § 1346(b). The Secretary's characterization of claims for emotional distress as sounding in tort is correct, as is his argument that the Federal Tort Claims Act provides the exclusive remedy for such claims, notwithstanding the waiver provision of the NHA. *Armor Elevator Co. v. Phoenix Urban Corp.*, 493 F.Supp. 876 (D.Mass.1980), *aff'd*, 655 F.2d 19 (1st Cir.1981). Because the pleadings in this case do not indicate that plaintiff filed an administrative claim within a two-year period as is required by the Tort Claims Act, this court does not have jurisdiction

over any tort claim in this case. Therefore, plaintiff's claims for damages for emotional distress must be dismissed.

■ Second, the Secretary argues that plaintiff's claim for treble damages in her third claim for relief are in the nature of a penalty and barred by *Commonwealth v. Hills*, 437 F.Supp. 351 (D.Mass.1977), which held that § 1702 does not waive immunity with respect to penalties for violations of the state sanitary code. *Cf. In re Sparkman*, 703 F.2d 1097, 1101 (9th Cir.1983) (federal agency "retains its immunity from punitive damages unless Congress *explicitly* authorizes liability for such damages"). Since § 1702 contains no explicit waiver of immunity from suit for punitive damages, plaintiff's claim for treble damages is barred by sovereign immunity and must be dismissed.

In summary, because I have concluded that plaintiff's claims are based on the Secretary's actions in carrying out the provisions of the NHA, that the separate fund requirement does not apply in the First Circuit, and that the Secretary has not clearly shown that the enforcement of plaintiff's claims would be inconsistent with the statutory scheme, I hold that, with the exception of tort claims and claims for punitive damages, the Secretary has waived sovereign immunity under § 1702.

Defendant next argues that plaintiff fails to meet the requirements for the waiver of sovereign immunity in the Tucker Act, 28 U.S.C. § 1346(a)(2), which grants the district courts and the Court of Claims concurrent jurisdiction of contract claims against the United States not exceeding $10,000. Plaintiff argues that she can avoid the limitations of the Tucker Act, and can therefore assert claims in excess of $10,000 in this court, because she has a separate waiver of sovereign immunity in § 1702 and a separate grant of subject matter jurisdiction in 28 U.S.C. § 1331, federal question jurisdiction. *See Trans-Bay Engineers & Builders, Inc. v. Hills*, 551 F.2d 370 (D.C. Cir.1976).

I previously considered this question in *Armor Elevator, supra*, 493 F.Supp. 876, and concluded that the Court of Claims has exclusive jurisdiction of claims against the United States in excess of $10,000. The opinion in that case compared the text of the Tucker Act with that of 28 U.S.C. § 1491, the statute stating the jurisdiction of the Court of Claims. The Tucker Act grants district courts original jurisdiction of any civil action or claim against the United States, other than tax claims,

> not exceeding $10,000 in amount, founded either upon the Constitution, or any Act of Congress, or any regulation of an executive department, or upon any express or implied contract with the United States, or for liquidated or unliquidated damages in cases not sounding in tort....

28 U.S.C. § 1346(a)(2). Exactly the same phrases that appear after "not exceeding $10,000 in amount" also appear in § 1491. Examining the identity of the key language used in these two sections, as well as the text of the original version of the Tucker Act, the opinion in *Armor Elevator* drew the "compelling inference" that the Court of Claims had exclusive jurisdiction over claims of this type against the United States. 493 F.Supp. at 888–89. The opinion concluded that

> even if a basis might be found in 28 U.S.C. § 1331 or § 1442 or elsewhere supporting jurisdiction in the district courts, the more specific policy of exclusivity of jurisdiction in the Court of Claims overrides the more general jurisdictional grant found elsewhere.

493 F.Supp. at 889.

■ Plaintiff has not offered any compelling reason that the rationale of *Armor Elevator* should not be followed in this case. I therefore hold that the Court of Claims has exclusive jurisdiction of plaintiff's claims in excess of $10,000.

Plaintiff's brief states that "if the Court determines that Counts II and III should have been brought in the Court of Claims, then [plaintiff] would be willing to waive damages in excess of $10,000 so that all matters in this case will be resolved as

expeditiously as possible." Plaintiff's Trial Memorandum at 10, n. 4. Although such a waiver should generally appear in the pleadings, courts have accepted waivers appearing in briefs. *E.g., Professional Managers' Ass'n v. United States,* 761 F.2d 740 (D.C.Cir.1985). I conclude that plaintiff's waiver is sufficient for this court to maintain jurisdiction of her claims not exceeding $10,000.

## II.

I turn next to plaintiff's substantive claims and the Secretary's defense of federal statutory supremacy. The Secretary's defense of supremacy is based on several grounds, first, that the state laws on which plaintiff relies are expressly preempted by the NHA, second, that these state laws are preempted because they conflict with the NHA, and third, that a federal common law of an implied warranty of habitability would conflict with the NHA.

The courts that have considered this issue have applied a federal rule of decision to claims of an implied warranty of habitability in HUD leases. *Alexander v. HUD,* 555 F.2d 166 (7th Cir.1977) (applying federal rule of decision but dismissing claim), *aff'd on other grounds,* 441 U.S. 39, 99 S.Ct. 1572, 60 L.Ed.2d 28 (1979); *Chase v. Theodore Mayer Bros.,* 592 F.Supp. 90 (S.D.Ohio 1983) (denying motion to dismiss); *Techer v. Pierce (Techer II),* No. N–78–484 (D.Conn. Oct. 13, 1982) (granting plaintiff's motion for partial summary judgment); *Techer v. Roberts-Harris (Techer I),* 83 F.R.D. 124 (D.Conn.1979) (granting preliminary injunction against collection of rent). Plaintiff acknowledges that a federal rule of decision must apply to the determination of the Secretary's duties, but argues that the strong local interest in regulating landlord-tenant relations mandates the incorporation of state law as the rule of decision in this case. *See United States v. Kimbell Foods, Inc.,* 440 U.S. 715, 99 S.Ct. 1448, 59 L.Ed.2d 711 (1979).

The Secretary argues that the state landlord-tenant laws relied on by plaintiff—a state common law warranty of habitability and state statutes protecting quiet enjoyment of leased premises and regulating unfair and deceptive business practices—cannot be applied to him because they are all expressly preempted by regulations giving HUD the authority to set rents in apartments that it funds or controls. The regulations in force during plaintiff's tenancy, entitled "Local Rent Control," were codified at 24 C.F.R. Part 403 [now part 246]. The regulations stated that:

(a) ... The regulation of rents for projects coming within the scope of "Subpart C—Subsidized Insured Projects" [which includes the project containing plaintiff's apartment] is preempted in its entirety by the promulgation of these regulations....

(b) Any state or local law, ordinance, or regulation is without force and effect insofar as it purports to regulate rents of ... projects coming within the scope of Subpart C....

....

(d) These regulations may be offered as a defense to a proceeding by whomever initiated, which may be brought or threatened to be brought against any owner, mortgagor or managing agent of a project subject to these regulations who demands, receives or retains, or seeks to demand, receive or retain, rental charges approved by HUD, or as a basis for declaratory, injunctive or other relief against any person or agency, public or private, who attempts to enforce, or threatens to enforce, any state or local law, ordinance, or regulation which is without force and effect by reason of this regulation.

24 C.F.R. § 403.1 (1982).

The Secretary contends that because the state laws relied on by plaintiff allow a court to award damages or restitution as a remedy for the payment of excessive rent and thereby require that the court determine the fair rental value of the apartment, they are preempted by Part 403. According to this argument, a judicial determination of a fair rental value is a "regulation"

that "purports to regulate rents" and is therefore expressly preempted by § 403.-1(b).

The Secretary has not offered any authority in support of his argument that Part 403 was meant to apply to a judicial determination of appropriate damages or restitution made pursuant to a holding that HUD, as landlord, was liable for violating a duty owed to a tenant. Rather, the title of the regulation in question—"Local Rent Control"—and the plain meaning of its text, show that it was designed to preempt local rent control ordinances. *See City of Boston v. Harris*, 619 F.2d 87, 93–94 (1st Cir.1980). Based on the plain language of the statute and the lack of authority to the contrary, I conclude that a court ordered remedy based on a fair rental value for an apartment is not the type of "regulation" of rents expressly preempted by Part 403.

Under the Supremacy Clause, even where state law is not expressly preempted or displaced by a comprehensive statutory scheme, a state law that "actually conflicts" with federal law is nullified to the extent of that conflict. *See Hillsborough County, Fla. v. Automated Medical Laboratories, Inc.*, 471 U.S. 707, 713, 105 S.Ct. 2371, 2375, 85 L.Ed.2d 714 (1985). In the second part of his supremacy defense, the Secretary argues that the state laws on which plaintiff relies are preempted because they conflict both with HUD's rent-setting procedures and its property disposition program.

As to the rent-setting procedures, the Secretary argues that a judicial order of damages or restitution based on a fair rental value for the plaintiff's apartment would conflict with HUD regulations in force during the time of her tenancy which required that in approving rents, HUD was to give consideration to providing rental income necessary to "maintain the economic soundness of the project" and "provide a reasonable return on the investment consistent with providing reasonable rentals to tenants." 24 C.F.R. § 221.531(c)(1) and (2) (1982). The Secretary contends that plaintiff's state law claims require the court to determine the rent for the apartment without reference to the criteria set forth in the regulations and thus are in conflict with them.

The Secretary's argument equates a court order of damages or restitution made with reference to rent paid with the setting of rents. Yet plaintiff has not asked the court to adjust her rent to an appropriate level based on a disagreement with HUD's determination of the proper rents for the project. Rather, plaintiff claims that HUD has violated a duty owed to her by renting an apartment that was uninhabitable and seeks damages or restitution to remedy that breach. The Secretary is not free to violate his duty as to habitability and escape responsibility by calling the remedy "rent setting." If the Secretary violated a duty owed to plaintiff to rent her a habitable apartment, then any relief granted by the court is a remedy for the breach of that duty and is wholly distinct from a prospective determination of the appropriate rent for the projects. The Secretary's responsibility to set rents for property he controls in accordance with the regulations can co-exist with his obligation to fulfill all the legal duties to which he is subject. I conclude that remedies for the breach of such duties in the form of damages or restitution measured with reference to rent charged do not conflict with the Secretary's ability to set rents.

In the second part of his conflict argument, the Secretary argues that state laws which would impose a particular standard of habitability on HUD projects would conflict with his statutory and regulatory discretion to manage the projects and are therefore invalid as applied to him. First, the Secretary contends that the NHA denies him the authority to spend money to bring properties into a habitable condition during the MIP period. The Secretary relies on § 207(k) of the NHA, which states that when acquiring possession of a property after a mortgagor's default:

[T]he Secretary is authorized ... to exercise all the rights of a mortgagee under

such mortgage, including the right to sell such mortgage, and to take such action and advance such sums as may be necessary to preserve or protect the lien of such mortgage.

12 U.S.C. § 1713(k). Although the Secretary argues that this section does not allow any expenditures during the MIP period beyond those that would "preserve or protect the lien," HUD's policies for the operation of MIP properties allow additional expenditures. Under official HUD policy in effect at the time of plaintiff's tenancy, during the MIP period,

> The Director shall ... provide necessary services and equipment and maintain the property in good condition.
>
> a. *Expenditures.* Project expenditures must not exceed income. However, under circumstances requiring emergency repairs to maintain tenant services, to protect the Secretary's investment in the property, or to eliminate health and/or safety hazards, the Director may authorize expenditures for which HUD will have to advance funds.

HUD Property Disposition Handbook 4315.1, Agreed Statement of Facts at Exhibit 1, para. 57.

In addition, HUD's management policy with respect to MIP and HUD-owned properties during the relevant time period required that "[a]ll rental housing projects must be brought to [a decent, safe, and sanitary] condition." Memorandum from Ass't Secretary Philip D. Winn (Nov. 3, 1981), Agreed Statement of Facts at Exhibit 2. Under this policy, repair authorizations for both MIP and HUD-owned projects were limited to:

> (1) Providing regular maintenance through on-site staff and, if needed, by contract service. Redecorating expenses due to tenant turnover, repairs to leaky faucets, broken windows, etc., are examples. Preventive maintenance through local contract sources may be essential for more complex systems, such as elevators and boilers.

> (2) Completing repairs needed on an emergency basis to protect life, health, and safety; failure of a heating system in the winter is an example.

*Id.* at 3. Thus, during the MIP period, official HUD policy authorized expenditures on an emergency basis for maintenance of tenant services and for the protection of life, health, and safety. I therefore conclude that the limitations on his authority asserted by the Secretary are contrary to official HUD policy.

The Secretary next argues that regardless of his authority to spend money during the MIP period, the NHA and the Housing and Community Development Amendments of 1978 ("Amendments") grant him absolute discretion over the management and disposition of property under his control, and that state laws which require property to be maintained in accord with a particular standard of habitability conflict with this absolute discretion. In response, plaintiff argues that the statutes impose a duty on the Secretary to provide decent, safe, and sanitary housing in all property under his control, and that the state laws which she asserts are fully consistent with that duty. Thus, in order to resolve the Secretary's claim of conflict, I must first determine the Secretary's duties under the NHA and Amendments.

It is clear that the NHA and Amendments grant the Secretary a substantial degree of discretion in the management and disposition of HUD-owned or MIP property. The Housing Amendments grant the Secretary the discretion to manage property in accordance with what are described as potentially competing goals:

> It is the policy of the United States that the Secretary ... shall manage and dispose of multifamily housing projects which are owned by the Secretary in a manner consistent with the National Housing Act [12 U.S.C.A. § 1701 et seq.] and this section. The purpose of the property management and disposition program shall be to manage and dispose of projects in a manner which will pro-

tect the financial interests of the Federal Government and be less costly to the Federal Government than other reasonable alternatives by which the Secretary can further the goals of—

(1) preserving the housing units so that at least those units which are occupied by low- and moderate-income persons or which are vacant, at the time of acquisition, are available to and affordable by such persons;

(2) preserving and revitalizing residential neighborhoods;

(3) maintaining the existing housing stock in a decent, safe, and sanitary condition;

(4) minimizing the involuntary displacement of tenants;

(5) minimizing the need to demolish projects; and

(6) maintaining the project for the purpose of providing rental or cooperative housing.

The Secretary, in determining the manner by which a project shall be managed or disposed of, may balance competing goals relating to individual projects in a manner which will further the achievement of the overall purpose of this section.

12 U.S.C. § 1701z–11(a). In addition, the Amendments provide that:

Except where the Secretary has determined on a case-by-case basis that it would be clearly inappropriate, given the manner by which an individual project is to be managed or disposed of pursuant to subsection (a) of this section, the Secretary shall seek to—

(1) maintain all occupied multifamily housing projects owned by the Secretary in a decent, safe, and sanitary condition . . .

12 U.S.C. § 1701z–11(c).

Thus, the Amendments grant the Secretary the discretion to weigh potentially competing goals in a particular project and to override the goal of maintaining projects in a decent, safe, and sanitary condition upon a specific determination that the goal would be clearly inappropriate for that project. In addition, HUD regulations concerning the objectives for the disposition of HUD-owned property state that, "[t]hese are national objectives and, while local circumstances may make it impossible to meet all the objectives, they should be met to the greatest extent feasible." 24 C.F.R. § 290.20.

Although this examination of the statutes makes it clear that the Secretary is granted substantial discretion in the management and disposition of property, it is not clear that he has the absolute discretion which he has asserted to maintain property in an indecent, unsafe, or unsanitary condition. The Amendments reassert the national goal of providing "a decent home and a suitable living environment for every American family," 12 U.S.C. § 1701t (quoting 42 U.S.C. § 1441), and mandate that the Secretary seek to provide decent, safe, and sanitary housing. See 12 U.S.C. § 1701z–11(a) and (c). Although the Secretary is granted the discretion to weigh the competing goals of § 1701z–11(a), the goal of providing decent, safe, and sanitary housing is given additional weight by § 1701z–11(c), which requires that the Secretary must always seek to meet that goal unless he specifically determines that to do so would be inappropriate in a particular case.

Congress' concern for providing decent, safe, and sanitary housing is also seen in the Senate reports on the Amendments, which proclaim that providing decent housing is the "principal goal" of the property management and disposition program and explain that the Amendments were enacted in response to HUD's failure to maintain its properties adequately:

Section 209(a) [now § 1701z–11(a)] of the bill would establish national policy goals for property management and disposition. It is the committee's intention that the principal goal of the program shall be to maintain the existing stock of multifamily projects as decent housing available for and affordable by low- and moderate-income families.

. . . .

Section 209(c) [now § 1701z–11(c)] would require that the Secretary of Housing and Urban Development maintain all HUD-owned multifamily projects in decent, safe, and sanitary condition. The committee has received testimony that many projects have actually deteriorated during the period of HUD ownership and that HUD has been unresponsive in many cases to the need for adequate maintenance of HUD-owned properties.

S.Rep. No. 871, 95th Cong., 2d Sess. 23, *reprinted in* 1978 U.S.Code Cong. & Admin.News 4773, 4796.

In addition, HUD regulations on management objectives state:

The management of HUD-owned multifamily housing projects shall be carried out in accordance with the objectives listed below:

(a) To provide a level of services necessary to maintain occupied housing in decent, safe and sanitary condition in the most cost efficient manner;

. . . .

(d) To provide and to occupy fully as many decent, safe, and sanitary dwelling units as possible, consistent with the need for the type and size of the units . . . .

24 C.F.R. § 290.10.

The Secretary contends that these statutes refer only to HUD-owned property, and therefore do not control his actions in this case. Under official HUD policy, however, the MIP period is to be governed by the same policies and procedures that apply to HUD-owned property. *See* HUD Handbook, *supra,* at para. 57; Winn Memorandum, *supra,* at 3. Therefore, under the Secretary's own policies, these statutes are relevant to defining the Secretary's duties to plaintiff.

The Secretary also argues that these statutes and regulations do not create a duty to maintain decent, safe, and sanitary housing, as plaintiff claims, but only set forth the goals which HUD must strive to attain. *Cf. Ramos Perez v. United States,* 594 F.2d 280, 287 n. 11 (1st Cir.1979) (similar policy statement in United States Housing Act of 1937, 42 U.S.C. § 1437, *et seq.,* did not create duty to ensure that all HUD-funded housing was hazard free). It is true that, despite the mandatory language of the Senate report on the Amendments, the text of § 1701z–11(a) and (c) states only that the Secretary "shall seek" to maintain housing in a decent, safe, and sanitary condition. Similarly, the regulations refer to the provision of decent, safe, and sanitary housing as a "management objective." Nevertheless, under § 1701z–11(c), the Secretary is required to seek to maintain decent, safe, and sanitary housing unless he has determined that to do so would be "clearly inappropriate" in a particular case. Thus, the argument that the Secretary has the absolute discretion to maintain property under his control in a condition of disrepair is without merit, unless he has made a specific determination that such a condition is appropriate in that case. In the absence of such a determination, the Secretary is under a clear statutory duty to seek to maintain all property under his control in a decent, safe, and sanitary condition.

In order to be meaningful, the congressional mandate that the Secretary seek to provide decent, safe, and sanitary housing must be interpreted to impose a duty on him to take reasonable steps to fulfill that goal. *Cf. Frisby v. HUD,* 755 F.2d 1052 (3d Cir.1985) (§ 1701z–11(a) is mandatory and not merely precatory; Secretary's actions must be consistent with goals it sets forth). Although the words "shall seek" do not impose a duty on the Secretary to have met the goal in all properties under his control at any particular time, under its ordinary meaning it imposes a duty on the Secretary to take reasonable steps to ensure that the goal is met. To interpret the statute otherwise would be inconsistent with the strength with which Congress has asserted the goal of providing decent, safe, and sanitary housing.

Furthermore, the statute directs the Secretary, when weighing the competing goals of § 1701z–11(a), to choose the least costly among "reasonable alternatives" by which

he can further the stated objectives. 12 U.S.C. § 1701z–11(a). I note that, in attempting to define what constitutes a "reasonable alternative," the Secretary's own policies recognize the need, at minimum, to eliminate hazards to life, health, and safety from HUD-owned and MIP property. During the MIP period, local directors are authorized to exceed project income "to eliminate health and/or safety hazards." HUD Handbook, *supra*, at para. 57(a). Similarly, the repair policy for both HUD-owned and MIP projects allows repair authorizations for "[c]ompleting repairs needed on an emergency basis to protect life, health, and safety." Winn Memorandum, *supra*, at 3.

This policy was expressly applied to the Washington Apartments in a November 22, 1982, letter from a HUD official to Interim Management which stated:

It is a primary objective of the Department that this project be made safe and habitable for all of its tenants until such time as the properties may be rehabilitated. Our repair activities are directed towards the correction or elimination of those conditions which may cause peril to the health or safety of the tenants.

. . . .

You will take the necessary actions to implement an effective repair program, which will accomplish within *two (2) months* of the date of this letter, repairs to every occupied dwelling and public area to eliminate hazardous and unsanitary conditions, including but not limited to: holes in ceiling, wall and floor surfaces; leaking heating systems; kitchen and bathroom plumbing; defective stoves and refrigerators; windows and doors which are not secure from the elements; defective locks on apartment doors; dangerous stairs and balconies; defective lighting fixtures; electrical fixtures and any other condition which may cause harm or injure the inhabitants.

Letter from Philip Salamone, Chief of HUD's Property Disposition Branch (Nov. 24, 1982), Stipulation of the Parties (Docket No. 30) at Exhibit 21 (emphasis in original).

In light of Congress' express goal of providing "a decent home and a suitable living environment for every American family," its repeated emphasis on the goal of maintaining decent, safe, and sanitary housing, and the Secretary's policy of authorizing repairs on an emergency basis to protect life, health, and safety, I conclude that the reasonable alternatives available to the Secretary must include safeguards for the life, health, and safety of tenants. Thus, absent a specific determination by the Secretary that to do so would be clearly inappropriate in a particular case, I conclude that the Secretary is under a statutory duty to take reasonable steps to maintain all HUD-owned or MIP projects in a decent, safe, and sanitary condition, and that such steps must include safeguards for the life, health, and safety of the tenants.

Because I have concluded that the Secretary is under this statutory duty and does not have the absolute discretion to dispose of or manage property in an unsafe, unsanitary, or indecent manner, I must reject the Secretary's argument that any state law which would impose a duty on the Secretary as landlord is necessarily in conflict with his absolute discretion. Nevertheless, I must also reject the plaintiff's argument that the statutes impose an unqualified duty to provide decent, safe, and sanitary conditions in all respects in all property under his control. Even though the Secretary is subject to a duty to protect the lives, health, and safety of the tenants, § 1701z–11(c) grants him the discretion to determine that seeking to fulfill the goal of providing decent, safe, and sanitary housing would be inappropriate in a particular case, and § 1701z–11(a) allows him to weigh the goal of providing decent, safe, and sanitary housing with other objectives. Thus, any state law that required the Secretary to maintain or seek to maintain housing in a decent, safe, and sanitary condition in all cases would be in direct conflict with the discretion granted by § 1701z–11(c), and any state law that required the Secretary to meet a decent, safe, and sani-

tary standard in all cases beyond the elimination of life, health, and safety hazards would be in conflict with the discretion granted to the Secretary by § 1701z–11(a). *Cf. Chase v. Theodore Mayer Bros., supra,* 592 F.Supp. at 96–97 (state law claims of implied warranty of habitability in HUD leases dismissed for burdening Secretary's statutory discretion). Upon examination of the state laws relied upon by plaintiff, I conclude that they are in direct conflict with the statutory discretion granted to the Secretary and therefore cannot be applied to him. Plaintiff's second claim for relief alleges a breach of the right to quiet enjoyment under Mass.Gen.Laws Ann. ch. 186, § 14. According to the Massachusetts Supreme Judicial Court, the right to quiet enjoyment is a right to freedom from serious interferences, such as acts or omissions that impair the character or value of the leased premises. *Simon v. Solomon,* 385 Mass. 91, 431 N.E.2d 556 (1982). I conclude that a requirement that the Secretary maintain property in a way that does not impair its character or value conflicts with his statutory discretion to weigh competing goals and to determine that meeting the decent, safe, and sanitary standard would be inappropriate in a particular case. Therefore, plaintiff's second claim for relief under ch. 186, § 14 must be dismissed. Because plaintiff has failed to direct the court to any precedent in which a right to quiet enjoyment has been recognized under federal law, her second claim for relief under federal law must be dismissed as well.

■ Plaintiff's third claim alleges unfair and deceptive business practices under Mass.Gen.Laws Ann. ch. 93A, § 9. According to the Attorney General's Regulations promulgated under the statute, it is an unfair or deceptive act to "[r]ent a dwelling unit which, at the inception of the tenancy ... contains a condition which amounts to a violation of law which may endanger or materially impair the health, safety, or well-being of the occupant," or fail to remedy such a condition during the tenancy; or to rent premises "unfit for human habitation," or fail to maintain the premises "in a condition fit for human habitation." 940 C.M.R. § 3.17(1)(a) and (b). Although this statute may appear to be harmonious with the Secretary's statutory duty to protect tenants from hazards to life, health, and safety, it conflicts with the Secretary's discretion to determine that seeking to provide decent, safe, and sanitary housing would be clearly inappropriate in a particular case. Furthermore, imposing liability for violations of law at the inception of tenancy fails to allow the Secretary any time to correct existing deficiencies in properties assigned to him as MIP. I therefore conclude that plaintiff's claim under ch. 93A, § 9 must also be dismissed.

■ Plaintiff's first claim for relief asserts a cause of action for an implied warranty of habitability under both state and federal common law. This state law claim would impose a duty on the Secretary to maintain all properties under his control in accord with a specific standard of habitability and would thus also conflict with the Secretary's ability to determine that seeking decent, safe, and sanitary housing in a particular case is not appropriate. Thus, plaintiff's claim under state common law must be dismissed.

In summary, I have concluded that the Secretary is under a statutory duty to take reasonable steps to maintain property in his control in a decent, safe, and sanitary condition, unless he specifically determines that to do so would be inappropriate in a particular case, and that such steps must include the elimination of hazards to life, health, and safety. I have also concluded that the state law claims plaintiff has asserted conflict with the Secretary's discretion and must be dismissed.

### III.

I next consider whether plaintiff can maintain her claim that the Secretary has violated a warranty of habitability implied by law under federal common law.

In order to determine whether a warranty of habitability is implied by law in HUD's lease with plaintiff, under federal

common law, I must examine the statutes which empower HUD to enter into such leases and the existing common law with respect to such warranties. The discussion of the NHA and Amendments in Part II, *supra*, need not be repeated here. I concluded from my analysis of the relevant statutes and policies that, absent a determination that to do so would be inappropriate in a particular case, the Secretary is obligated to take reasonable steps to maintain all projects in a decent, safe, and sanitary condition and that such steps must include the removal of hazards to life, health, and safety.

I turn next to an examination of existing common law. Although a common law warranty of habitability has been held, as a matter of law, to be implied to be part of private, residential leases in a number of states, including Massachusetts, *see Boston Housing Authority v. Hemingway*, 363 Mass. 184, 293 N.E.2d 831 (1973), and has also been recognized by at least one federal court, *see Javins v. First National Realty Corp.*, 428 F.2d 1071 (D.C.Cir.), *cert. denied*, 400 U.S. 925, 91 S.Ct. 186, 27 L.Ed.2d 185 (1970), this represents a recent trend. Traditionally, a lease was recognized as a conveyance of an interest in land, and the common law did not recognize a warranty concerning the condition of any building on the land. The exchange was governed by the doctrine of caveat emptor; so long as the landlord delivered possession of the property, the tenant could not be released from his or her covenant to pay rent even if the premises were destroyed, and the landlord had no obligation to make any repairs. *Hemingway*, 363 Mass. at 194, 293 N.E.2d 831.

Courts that have recognized an implied-in-law warranty of habitability have concluded that the assumption that a residential lease primarily conveyed an interest in land may have been reasonable in a rural, agrarian society, but has little relevance in an urban setting: "[I]n the case of the modern apartment dweller, the value of the lease is that it gives him a place to live." *Javins*, 428 F.2d at 1074. The interest of such a tenant is no longer in the

land, or in mere possession, but in having a "package of goods and services ... [including] adequate heat, light and ventilation, serviceable plumbing facilities, secure windows and doors, proper sanitation, and proper maintenance." *Id.* As a result of the changing nature of the interest conveyed, modern urban leases have become increasingly complex. Landlords' duties to tenants typically extend far beyond delivery of possession, and leases typically include a large number of specific covenants containing obligations which are "predominantly contractual" in nature. *Id.* In response, courts have begun to interpret leases in accord with precepts of modern contract law rather than property law, including an implied warranty that goods are fit for their ordinary purpose or use. *Id.* at 1075 & n. 11. This "modern view ... recognizes that a lease is essentially a contract between the landlord and the tenant wherein the landlord promises to deliver and maintain the demised premises in habitable condition and the tenant promises to pay rent for such habitable premises. These promises constitute interdependent and mutual considerations." *Hemingway*, 363 Mass. at 198, 293 N.E.2d 831.

In *Javins*, Judge Wright held that a warranty of habitability is, as a matter of law, implied in law in leases for urban dwellings. The court found compelling reasons to replace the no-repair rule with an implied warranty of habitability both in the principles derived from consumer protection law and in the combined effect of the inequality in bargaining position between landlord and tenant, the increasingly severe shortage of adequate housing, and the finding that inadequate housing is detrimental to society as a whole. *Id.* at 1079.

Only a few courts have considered whether this common law implied-in-law warranty of habitability should be extended to HUD leases. The Seventh Circuit, the only circuit court to address this issue, refused to recognize an implied warranty of habitability in public housing project leases on the ground that it would be a warranty that the broadly stated objectives

of national policy expressed in the Housing Act of 1949, 42 U.S.C. § 1441, have been and are being met. *Alexander v. HUD*, 555 F.2d 166 (7th Cir.1977), *aff'd on other grounds*, 441 U.S. 39, 99 S.Ct. 1572, 60 L.Ed.2d 28 (1979). Because Congress had created these objectives, the court held that the establishment of such a warranty should be left to Congress, rather than the courts.

Significantly, *Alexander* was decided before the enactment of the Housing and Community Development Amendments of 1978, which mandate that the Secretary seek to provide decent, safe, and sanitary housing. 12 U.S.C. § 1701z–11(a) and (c). Although, as discussed in Part II, *supra*, the Amendments do not create a warranty that national objectives are in fact being met, Congress stated those objectives in a way that created a duty on the Secretary to take steps to provide decent, safe, and sanitary housing and to safeguard the life, health, and safety of tenants. Furthermore, in enacting the Amendments, Congress expressly stated that it was acting in response to HUD's failure to maintain its properties in a decent, safe, and sanitary condition. Thus, the statutes and accompanying duties which I have considered are different from those considered by the *Alexander* court.

District courts in two subsequent cases declined to follow *Alexander*, and instead extended the *Javins* holding to recognize an implied-in-law warranty of habitability in HUD leases. *Chase v. Theodore Mayer Bros., supra*, 592 F.Supp. 90; *Techer v. Pierce (Techer II)*, No. N–78–484 (D.Conn. Oct. 13, 1982); *Techer v. Roberts-Harris (Techer I)*, 83 F.R.D. 124 (D.Conn.1979). In *Techer I*, the court granted a preliminary injunction against the collection of rent in a HUD-owned project which plaintiffs alleged was maintained in an unhabitable condition. The court examined the common law and the statutes, including the Amendments, and concluded that "the existence of the implicit statutory mandate to provide decent, safe and sanitary housing together with the repeated Congressional concern over the failure to realize that goal

in a timely fashion offers a convincing basis to adopt the *Javins'* holding as the federal common law rule." 83 F.R.D. at 130. In a later decision granting plaintiff's motion for partial summary judgment, the magistrate found the recognition of a warranty of habitability to be fully consistent with the congressional goal of decent, safe, and sanitary housing, stating, "Indeed, what does seem inconsistent with Congressional policy is to allow a public agency to play the role of slumlord with impunity, collecting rents without regard for the tenants' living conditions." *Techer II, supra*, slip op. at 5.

The *Chase* court found the reasoning of the *Techer* decisions to be persuasive. The court noted that the Secretary was seeking to avoid the same responsibility that HUD enforced against landlords it subsidized:

> Essentially, the Secretary has ruled that buildings such as the ones in which plaintiffs live are not eligible for federal mortgage insurance unless they are "decent, safe, and sanitary." It would, we think, be a rather cynical perversion of the manifest intent of Congress to hold that HUD does not bear the same responsibility once the property is insured—and after default. The tenants of such housing have the right to seek judicial enforcement of that responsibility if it is not being carried out.

592 F.Supp. at 101.

■ Like the *Chase* and *Techer* courts, I conclude that the *Javins'* rationale is consistent with the statutory goal of providing decent, safe, and sanitary housing. Nevertheless, I conclude that the wholesale extension of the *Javins* holding to HUD leases cannot be supported. The essence of the *Javins* decision is to give the implied warranty the status of a contract term of the lease. The appropriate remedy for breach of such a contract term, as for any breach of contract, would be compensatory damages. Thus, the extension of the *Javins* implied warranty of habitability to HUD leases would create a legal duty on HUD to maintain housing in a habitable

condition and would expose the Secretary to liability for damages for violating the implied warranty. For reasons stated below, I conclude that the creation of a damage remedy for breach of the Secretary's duty cannot be supported.

A similar conclusion was reached in *Chase* and *Techer I and II*. Although the *Chase* and *Techer* courts endorsed the *Javins* holding and adopted the term "implied warranty of habitability," neither allowed the imposition of a damages remedy for "breach" of the warranty. In *Techer I*, the court granted a preliminary injunction prohibiting the further collection of rent on the ground that plaintiffs had shown a significant likelihood that they would be unable to recover their rental payments through a private damages remedy under the NHA. 83 F.R.D. at 130–31. The plaintiffs then argued that, even if a private right of action was not implied under the NHA, they were entitled to damages for HUD's breach of an implied contract term. The magistrate rejected plaintiffs' argument in *Techer II*:

> Plaintiffs do argue with some force that their claim is based on contract, not depending conceptually upon "the implication of a damage remedy under the National Housing Act".... Yet merely labeling a proposed claim "contractual" instead of "statutory" is not determinative, because even the "implied" contract condition represents a deliberate public policy choice.
>
> The issue is whether, and to what extent, to impose a duty upon the landlord as a matter of law to assure "habitability". Although basic fairness mandates some recourse to equity, the reflex provision as of right of consequential money damages is a wholly different question. That course would be a far-reaching step with unpredictable, and not necessarily beneficial, results overall even in its impact on HUD's ultimate discharge of housing assistance responsibilities, delegated by Congress with some necessary discretion meriting recognition. There just appears no convincing reason to adopt that approach.

*Techer II, supra,* slip op. at 6. *Cf. Burroughs v. Hills,* 564 F.Supp. 1007, 1017 (N.D.Ill.1983) (denying claim of implied right of action for damages under the NHA as contrary to statute's primary purpose of upgrading housing), *aff'd in part and rev'd in part on other grounds,* 741 F.2d 1525 (7th Cir.1984), *cert. denied,* 471 U.S. 1099, 105 S.Ct. 2321, 85 L.Ed.2d 840 (1985).

In *Chase,* the court cited with approval the *Techer* holding that a private right of action for damages was not implied under the statute and held that damages were not available, although the court did not specifically consider whether damages could be awarded under a breach of contract theory. I am aware of only one decision which allowed claims for monetary damages to proceed, *Wilson v. Pierce,* No. 81–264 (W.D.Pa. Aug. 11, 1982). *Wilson* offers very little support for plaintiff's claimed right to damages here, however, because that court was not required to and did not address the issue of remedies. In fact, the court in *Wilson* did not analyze plaintiffs' claims at all, but merely allowed them to survive a motion to dismiss on the ground that the court might find either a breach of an implied contractual provision or an abuse of discretion in the Secretary's failure to take steps to maintain property in a decent condition.

Despite their holdings that monetary damages would not be appropriate under the NHA, both the *Chase* and *Techer* courts held that they had the equitable power to enforce the implied warranty of habitability, including the power to order the pro rata restitution of rental payments made during any period in which the housing was not habitable. *Chase,* 592 F.Supp. at 100–01; *Techer II,* slip op. at 7. The advantages of equitable relief over damages are well stated in the *Techer* and *Chase* decisions. As the magistrate stated in *Techer II,* "[e]quitable intervention when public housing conditions are intolerable simply is not the equivalent of the troublesome judicial policy step of creating an open-ended right to sue for money damages." *Techer II, supra,* slip op. at 5.

Thus, although the *Chase* and *Techer* decisions use the term "implied warranty of habitability," it is clear that they did not fully extend the *Javins* holding to HUD leases. Instead, those courts exercised their federal common law making powers to create equitable remedies for duties imposed on the Secretary both by the housing statutes and the emerging common law of implied warranties of habitability.

Although I do not adopt them in their entirety, and do not use the term "implied warranty of habitability" to describe the Secretary's duties under the housing statutes, I conclude that the *Chase* and *Techer* decisions are both apt and persuasive in the present context. In contrast, *Alexander* is less closely analogous to the present case. *Alexander* held that Congress, rather than the courts, should declare whether the objectives expressed in 42 U.S.C. § 1441 created "an absolute, fixed obligation to maintain suitable dwellings," 555 F.2d at 171. As noted above, however, *Alexander* was decided before the enactment of the Housing and Community Development Amendments, and the court did not have the opportunity to evaluate the effect of the congressional mandates expressed therein. In addition, the *Chase* and *Techer* decisions are not wholly inconsistent with *Alexander*, as neither court imposed a fixed legal duty on the Secretary to maintain housing in a habitable condition, but instead held that the Secretary's duties could be enforced by the exercise of the court's equitable powers.

The Secretary contends that this court (and, implicitly, any higher court on review of the decision of this court) should not fashion federal common law in this case because, first, as plaintiff concedes, a private right of action for damages is not implied in the NHA under *Falzarano v. United States*, 607 F.2d 506 (1st Cir.1979), and second, the courts' common law making powers to define the obligations of the United States should yield to Congress' grant of discretion to the Secretary to manage and dispose of property in his control. This argument is not persuasive, however, because the courts have the ability to exercise their federal common law making powers in a manner which tailors equitable relief to fit the specific circumstances of a particular case, including the Secretary's exercise of discretion. In evaluating a claim, a court can take into consideration a wide range of relevant factors, including the existence of a § 1701z–11(c) determination that the goal of providing decent, safe, and sanitary housing was inappropriate for that project, the condition of the property when the Secretary assumed control as MIP, and circumstances indicating what steps the Secretary undertook to maintain the property in a decent, safe, and sanitary condition. Unlike damages, which would be granted to individual plaintiffs based on the specific conditions found in each of their apartments, a grant of equitable relief could be based on a consideration of the conditions of the project as a whole and could take into account efforts to make improvements throughout the project. Equitable relief would thus be more responsive to, and less of an intrusion on, the Secretary's discretion to manage the property in his control. I therefore conclude that federal courts can exercise their federal common law making powers to grant equitable relief for the Secretary's violation of duties owed to tenants without conflicting with the Secretary's discretion.

For the reasons stated, I have concluded that the NHA and Amendments impose a duty on the Secretary to take reasonable steps to maintain HUD-controlled property in a decent, safe, and sanitary condition, unless the Secretary determines that to do so would be clearly inappropriate in a particular case, and that such steps must include the elimination of hazards to life, health, and safety. I conclude as well that federal courts, pursuant to their federal common law making powers to interpret the obligations of the United States, can enforce those duties by granting equitable relief for their violation.

### IV.

Having concluded that the Secretary owes a duty to HUD tenants to take rea-

sonable steps to maintain their apartments in a decent, safe, and sanitary condition unless he specifically determines that to do so would be clearly inappropriate, and that such steps must include the elimination of hazards to life, health, and safety, I must now examine the evidence concerning the condition of plaintiff's apartment to determine whether the Secretary violated his duty to the plaintiff in this case.

The bulk of the evidence concerning the conditions in plaintiff's apartment is in the form of jointly submitted inspection reports, service requests, purchase orders, invoices, photographs, and correspondence between HUD and the project manager. *See* Agreed Statement of Facts (Docket No. 44) at Exhibits 3 and 4; Stipulation of the Parties (Docket No. 30) at Exhibits 6, 8, 12, and 14–17. In addition, plaintiff has submitted her own affidavit with medical records and a paint analysis report attached, inspection reports from apartments not in plaintiff's building, and affidavits from tenants of apartments not in her building. Plaintiff's Appendix to Memorandum in Support of Motion for Summary Judgment (Docket No. 34) at B and C. I will not consider these reports and affidavits concerning apartments outside of plaintiff's building because they do not pertain to the condition of plaintiff's apartment, which is the sole issue here.

The Secretary became MIP of the Washington Apartments on May 10, 1982. Agreed Statement of Facts at para. 4. The Secretary has not proffered any evidence that, at any time during the MIP period, he determined under § 1701z–11(c) that it would be clearly inappropriate to seek to provide decent, safe, and sanitary housing in this project.

On May 6, 1982, the City of Boston Housing Inspection Department prepared a complaint concerning plaintiff's apartment which stated that the front door, kitchen ceiling and wall, living room ceiling, and hall wall were all not in good repair, and that the bedroom ceiling was leaking. Stipulation at para. 5 and Exhibit 6. The complaint form contained the following pre-

printed statement: "It is hereby stated that said violations may endanger or materially impair the health or safety, and the well-being of any tenant therein or persons occupying said property." Since the complaint was issued just four days before HUD took over as MIP, it can be assumed that these conditions existed at the start of the MIP period.

An undated HUD Physical Property Report presumably completed at the inception of the MIP period stated that all six units in plaintiff's building needed storm doors and windows, new screens and shades, refinished floors, a new refrigerator and stove, new kitchen cabinets and mailboxes, paint, and insulation for the pipes. Agreed Statement of Facts at Exhibit 4. In addition, the report noted that some of the units needed new floors, windows and frames, and doors, but did not specify which apartments required these items.

The next inspection of plaintiff's apartment was performed by Interim Management on June 24. Interim reported that repairs were needed for the hall, bathroom, and living room ceilings, the kitchen cabinets and ceiling, the living room window frames, and the back door to the porch. Stipulation at para. 7 and Exhibit 8. In addition, the report noted that all walls and ceilings needed painting, some floors needed refinishing, all windows needed screens and shades, window frames needed to be scraped and painted, and a new refrigerator and stove were required.

On August 10, the Boston Housing Inspection Department inspected plaintiff's apartment and served a complaint on Interim which contained the same pre-printed statement concerning possible impairment of health and safety as the complaint form issued on May 6. *Id.* at para. 11 and Exhibit 12. The violations noted were that the kitchen and hall walls, and the bathroom, living room, and kitchen ceilings were all not in good repair. Although defendant has stipulated that this exhibit is a true and correct copy of the report, he has not admitted receipt of the report or knowl-

edge of the conditions contained therein. *See* Stipulation at para. 11, 15, 16.

The parties have submitted photographs of the plaintiff's apartment taken on October 21, 1982. Stipulation at para. 17 and Exhibit 16. Many of these photographs show evidence of scraping, plastering, and painting work that HUD had authorized, which was completed on October 22. *See* Agreed Statement of Facts at Exhibit 3. Photographs number 4, 5, 6, 8, and 9 all show areas that either had been freshly plastered or required plastering. According to the parties' stipulation, photograph number six shows a master bedroom wall, after repairs had been made. Stipulation at para. 17. The photograph indicates that a crack in the wall was not fully repaired. Photograph number one shows tiles missing from the floor and wall behind the toilet; number two shows paint on the floor of the master bedroom and what appears to be a small hole in the floor board behind a vertical pipe; number three shows that the entire center panel of the door in the "doorway to back stairs and porch" is missing—it appears that this is the back entrance to the building rather than to plaintiff's apartment; number seven shows the exterior front entry door, from which the lock appears to be missing; number 10 shows wallpaper peeling from a ceiling, leaving an entire corner of wall exposed; number 11 shows evidence of severe water damage to the wall, floor, and cabinet below the kitchen sink; and number 12 shows peeled paint on the bathroom window sill and frame, and a badly torn shade.

On December 3, the HUD Chief of Property Disposition issued a memorandum advising project managers for several projects, including the Washington Apartments, that he had learned that some of them had not been keeping their projects and grounds clean. Stipulation at Exhibit 15. The memorandum does not specifically mention the condition of the Washington Apartments project or plaintiff's building.

On January 31, 1983, the day plaintiff moved out of the apartment, a professional "Home Inspector" inspected the apartment and reported his findings in a memorandum to plaintiff's attorney. Agreed Statement of Facts at Exhibit 4. He found a number of defects in the common areas, including that the doors to the front and rear entrances to the building and to the exterior second floor porch would not properly close and/or lock; the front entry electric doorbell/buzzer system did not work; there were holes in the floor of the second floor exterior porch; the rear stairwell lighting was defective and railings required baluster repair; and many of the glass storm window inserts were broken or missing. In plaintiff's apartment he found a number of defects including mice and cockroaches; a missing baseboard and a mouse hole by the kitchen sink base cabinet; broken cabinets and doors; broken lights; windows that were not weathertight, some of which were stuck with paint in a shut position; one window had broken glass, one could not be locked, and two would not stay closed unless locked; the living room ceiling was water damaged; the bedroom flooring was splattered with paint and the ceiling was peeling; the lavatory and bathtub faucets were loose on the wall; there was a hole in the wall behind the toilet; and some hall flooring was loose.

Pictures taken on the same day show a displaced threshhold in the doorway between bedrooms; water damage and missing doors in the kitchen cabinet below the sink—although the area to the right of the sink had been plastered since the October 21 photographs were taken; holes in the exterior porch; water stains on the ceiling in the master bedroom; paint on a bedroom floor; and patches of peeled paint on the living room ceiling. Stipulation at para. 17 and Exhibit 17.

In addition to the problems described above, plaintiff states in her affidavit that she had roaches and mice "all the time," and she has submitted medical records that show her son was treated for rashes and insect bites several times in the period from 1980 to 1982. Affidavit of Marie Conille at para. 3 and Appendix 1. She stated that Interim never sprayed her apartment,

and that rats came into the apartment from holes in the walls and floors. *Id.* at para. 3. It should be noted, however, that only one of the inspection reports concerning plaintiff's apartment—the report of the inspection done on the last day of plaintiff's tenancy at the request of her attorney—mentions the presence of mice and cockroaches, and there is no evidence that plaintiff had made service requests concerning this problem. Although in an August 24 letter, Interim's Property Manager informed HUD that Interim had not yet been contacted by the HUD-approved exterminator and stated "I have yet to hear from anyone, who will be working in Washington Apartments," the letter did not include plaintiff's building as one of those described as infested or as one in which tenants had made complaints. Stipulation at Exhibit 14.

Plaintiff also states in her affidavit that Interim's repairs to the apartment walls and ceilings were inadequate because the workers spilled paint on the floors and the paint and plaster were falling again soon after the repairs were completed. *Id.* at para. 4. She also submitted a laboratory report from the inspection performed on January 31, 1983, which indicated that some of the baseboards, windows, and door jambs and the kitchen walls had paint with an excessive lead content. *Id.* at Appendix 2. In addition, she stated that one of the radiators was broken, that the heat would break down every winter, and that Interim never did anything to correct the problem. *Id.* at para. 5.

The evidence shows that HUD made some efforts to repair plaintiff's apartment during her tenancy. HUD authorized a new refrigerator to be shipped to her apartment on July 20. Agreed Statement of Facts at Exhibit 3. Nevertheless, before the new refrigerator was purchased, the need to replace the refrigerator had been noted on the HUD Physical Property Report and on Interim's reports of service calls to plaintiff's apartment on June 29, July 10, and July 13. Stipulation at para. 8 and Exhibits 9 and 9A. Plaintiff had also contacted the Boston Housing Inspection Department which, on July 29, after the new refrigerator had been shipped, issued a complaint stating that the refrigerator was unfit for its intended use. *Id.* at para. 9 and Exhibit 10.

HUD authorized the scraping, plastering, and painting of plaintiff's apartment, which began in mid-October and was completed on October 22. Agreed Statement of Facts at Exhibit 3. Before that work was authorized, however, the need for it had been noted in the initial HUD Physical Property Report and in Interim's report of its June 24 inspection, which was made in response to plaintiff's June 21 complaint about her ceiling. Stipulation at para. 7 and Exhibit 8. In addition, on July 28, Interim responded to plaintiff's complaint of a leak in the ceiling and noted that the problem was not fully repaired, and on August 10, the Boston Housing Inspection Department served a complaint on Interim concerning the disrepair of the walls and ceilings. *Id.* at para. 8(f) and 11, and Exhibits 9 and 12. Although HUD has denied knowledge of this report and the conditions contained therein, the HUD Purchase Order and Payment Authorization Form concerning this work indicates that it was done to repair a housing court violation. Agreed Statement of Facts at Exhibit 3. Even after the work was completed, there is evidence that not all the cracks were fully repaired, water continued to leak through the ceiling in the master bedroom, and the workers had splattered paint on the floors.

In addition, repairs were made in response to plaintiff's complaints of a broken socket by her kitchen sink on July 26 and to repair a short circuit on July 10. Stipulation at para. 8 and Exhibits 9 and 9B. Although the HUD Purchase Order and Payment Authorization Form concerning electrical repairs performed on July 26 states that the work done in plaintiff's unit was to replace a smoke detector, and that short circuits were repaired in other apartments, this appears to be a mistake, as the service request form for plaintiff's apartment on that date clearly indicates that a short circuit was repaired.

The evidence shows that the Secretary did not take any steps to repair other defects in plaintiff's apartment. There is no evidence that defendant ever exterminated plaintiff's apartment. There is also no evidence that defendant took any steps to improve tenant security by repairing the doors to the front and rear entries to the building or the door to the second floor porch. There is no evidence that the Secretary took any steps to repair the holes in plaintiff's porch floor. There is no evidence that the Secretary was aware of or took any steps to remove paint with an excessive lead content from some of the door and window jambs and the kitchen walls. Finally, there is no evidence that defendant took any steps to repair the plaintiff's kitchen cabinets, window screens and shades, or the missing tiles in the bathroom.

■ This evidence presents a genuine issue as to whether the Secretary violated his duty to take reasonable steps to provide the plaintiff with decent, safe, and sanitary housing, which included eliminating hazards to the lives, health, and safety of the occupants of plaintiff's apartment. It is unnecessary for me to decide this issue, however, because for reasons stated below, I conclude that even if I were to hold that the Secretary did violate this duty, plaintiff would not be entitled to the sole relief available to her in this case—restitution of rental payments—and, therefore, her claim under federal common law must be denied.

The evidence shows that the plaintiff's apartment did not meet a decent, safe, and sanitary standard when the Secretary took possession of plaintiff's apartment in May of 1982, and that it still fell short of full compliance with a decent, safe, and sanitary standard at the end of plaintiff's tenancy on January 31, 1983. The Secretary admits that the apartment was not in full compliance with the Massachusetts Sanitary Code throughout plaintiff's tenancy. Agreed Statement of Facts at para. 11. Nevertheless, this is not a case in which the evidence shows increased deterioration once the Secretary took over as MIP, nor is it a case in which the Secretary took no steps at all to improve the premises and fulfill his duty to seek to provide decent, safe, and sanitary housing.

■ Because plaintiff is no longer a HUD tenant, the only equitable relief available to her is the restitution of rental payments. Although I have concluded that restitution, as a form of equitable relief, can be an appropriate remedy for the Secretary's violation of his duties to HUD tenants, I am mindful of the similarity between restitution and an award of damages. The same factors that make damages an inappropriate remedy in this context counsel that an order of restitution should not be made lightly. Although I do not mean to minimize either the extent of the defects in plaintiff's apartment or the Secretary's duty to protect his tenants from hazards to life, health, or safety, I do not conclude that the defects involved or the possible violations of the Secretary's duties in this case are extreme enough to warrant the rather extraordinary remedy of an order of restitution.

In conclusion, I hold that plaintiff cannot maintain causes of action against the Secretary based on state landlord-tenant laws because the laws on which she relies conflict with the discretion granted to the Secretary by the NHA and Amendments. I also hold that the Secretary is subject to a statutory duty, enforceable by the equitable powers of the federal courts, to take reasonable steps to maintain HUD-owned and MIP property in a decent, safe, and sanitary condition, unless he determines that to do so would be clearly inappropriate in a particular case, and that such steps must include the elimination of hazards to life, health, and safety. However, because I have concluded that the restitution of rental payments would not be an appropriate remedy in this case, and no other equitable relief is available to the plaintiff, I deny plaintiff's federal common law claim.

Accordingly, the state law claims in Counts I, II, and III are dismissed. The federal law claim in Count II is dismissed,

and the federal law claim in Count I is denied. Count IV, in which plaintiff asserts a claim for the Secretary's failure to return her security deposit, was not briefed by the parties, and I therefore will not rule on it at this time.